COUNCIL FOR PERIODICAL DIS-
TRIBUTORS ASSOCIATION, et
al., Plaintiffs,
v.
James H. EVANS, etc., et al.,
Defendants.
Civ. A. No. 86-T-282-N.
United States District Court,
M.D. Alabama, N.D.
July 14, 1986.

Holly L. Wiseman, Markstein, Morris & Lies, Birmingham, Ala., Burton Joseph, Barsy, Joseph & Lichtenstein, Chicago, Ill., Robert Segall, Copeland, Franco, Screws & Gill, Montgomery, Ala., for plaintiffs.

J. Bernard Brannan, Jr., Montgomery, Ala., for defendants John Wilson and City of Montgomery.

H. Lewis Gillis, Gillis & Nesbitt, Thomas T. Gallion, III, Haskell, Slaughter, Lew & Young, Montgomery, Ala., for defendants James H. Evans and Thomas O. Kotouc.

### MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

This lawsuit is a challenge to the efforts of a state district attorney to stop the sale

of allegedly sexually explicit magazines in Montgomery County, Alabama. The plaintiffs claim that the actions of the district attorney and a special task force he created constituted "a prior restraint" and were "retaliatory," in violation of the first amendment to the U.S. Constitution. The plaintiffs have premised this lawsuit on 42 U.S.C.A. § 1983 and have properly invoked the court's jurisdiction pursuant to 28 U.S.C.A. §§ 1331, 1343. They seek declaratory and injunctive relief.

The plaintiffs are Penthouse International, Ltd., one of its affiliates, Newlook International, Ltd., and Playboy Enterprises, Inc., three national publishers of adult magazines; the International Periodical Distributors Association, Inc. and the Council for Periodical Distributors Associations, two trade associations representing periodical wholesalers and distributors nationwide; and Martin E. McCaffery, a local reader of adult magazines. The defendants are James H. Evans, the district attorney for Montgomery County; Thomas O. Kotouc, a special prosecutor assigned to the district attorney's task force on pornography; John H. Wilson, the chief of police for the City of Montgomery; and the City of Montgomery itself.

For reasons that follow, the court concludes that the district attorney and his task force have violated the first amendment and that the plaintiffs are thus entitled to declaratory and injunctive relief.

## I.

The present controversy began in 1984 when district attorney Evans received citizen complaints that a local book and magazine distributor was selling sexually explicit magazines to various convenience stores in the Montgomery area. Evans met with the distributor and asked him voluntarily to stop selling such magazines. He informed the distributor that the magazines probably violated Alabama's obscenity laws, and that it would be his duty to initiate either a civil nuisance proceeding or a criminal obscenity prosecution. The distributor refused to cooperate, stating that if he stopped selling such magazines other companies would simply take his place; the distributor added that he applied self-policing mechanisms to filter out "hard core" pornography and that any attempts to initiate legal proceedings against him would precipitate lawsuits by national publishers.

Having failed to secure voluntary cooperation, Evans decided to establish a task force to study various methods for stopping the pornography problem in Montgomery County. He appointed to the task force various officers from his white collar crime unit and special assistant district attorney Thomas O. Kotouc. The City of Montgomery, the Montgomery County Sheriff's Department, the Montgomery County Commission, and the Alabama Department of Public Safety also provided personnel for the task force.

The task force met several times to consider alternatives for combatting pornography. Criminal prosecutions of national actors were rejected in favor of a quiet, local resolution to the problem. The task force, however, also opposed prosecutions of local merchants. Evans viewed merchants as law-abiding citizens who should not be treated as criminals. The district attorney and the task force then agreed that a civil resolution pursuant to Alabama's civil nuisance laws would provide a local, quiet yet effective mechanism for halting the sale of adult magazines in Montgomery County on a permanent basis. They concluded that they would pursue a civil resolution by initially seeking a consent decree from the local merchants and that, to help ensure that merchants agreed to the decree, they would also present a credible threat of criminal prosecution. Thus, even though the task force had ruled out a criminal resolution, it proceeded as if it were embarking on a bona fide investigation whose ultimate aim was the return of criminal indictments. Between July and December

of 1985, a task force member assigned by the City of Montgomery purchased several magazines, including publications by Penthouse, Newlook, and Playboy, from various retailers in the Montgomery area.

Evans then employed those magazines to communicate the task force's threat of prosecution. Evans and several task force members met with the distributor. After explaining that the task force had purchased numerous adult magazines from retailers during the past six months, the district attorney added that those magazines could be linked to specific deliveries from the distributor. He warned that, on the basis of evidence collected thus far, he could seek the distributor's indictment for the sale and distribution of obscene materials. He added that several citizens had recently threatened to swear out an arrest warrant if the district attorney's office did not take action. In sum, he was ready to "take on" the distributor. Evans then offered the distributor what he termed an "alternative or opportunity" to avoid prosecution by signing a civil consent decree banning the future sale of such magazines. It was understood that criminal indictments would not be returned if the distributor signed the proposed decree. In the face of this presentation, the distributor's prior resistance suddenly vanished. Stating that he "did not want to fight with the district attorney" the distributor agreed to sign a civil consent decree, but with the understanding that Evans would attempt to secure similar agreements from local retailers.

Evans then pursued the retailers. In a December 10, 1985, letter, on official letterhead, Evans issued what he termed an "informal invitation" to attend a meeting in the county courthouse on December 20. In that letter, the district attorney explained that the task force had been investigating the sale of obscene materials in Montgomery County for six months, that he "would like to meet" with the retailers about magazines and books that "may be in violation of state obscenity laws," and that the retailers should call designated persons in the

police department and district attorney's office "to confirm your attendance at this meeting." Evans "strongly suggested" that the retailers appear with counsel, and closed with the following: "We would appreciate your appearance at the aforesaid meeting, based solely on this informal invitation, however, we, of course, have the right and power to issue District Attorney or Grand Jury subpoenas if you or your attorney require or prefer the lawful service of process before communicating with this office."

Between 25 to 30 retailers attended the December 20 meeting, which was held in a courtroom at the county courthouse. Some attended with counsel. Evans, accompanied by several task force members, spoke from behind a display of magazines purchased during the task force's investigation. Several publications by Penthouse, Newlook, and Playboy were included in the display. The district attorney began with the observation that previous informal efforts to stop the pornography problem in Montgomery County had failed, and that this time he wanted to stop the problem once and for all. He stressed that a grand jury set to convene in February would probably find the magazines obscene, and that persons selling those magazines could well be indicted. He then expressed his hope that a civil resolution of the problem could be reached "rather than having to seek criminal indictments." It was understood that anyone who cooperated by signing a proposed decree banning future sales of such magazines would not be indicted.

After Evans spoke, he asked the retailers to "judge for themselves" whether Alabama's obscenity laws had been violated. The magazines were arranged in stacks according to where they had been purchased, and a list of the magazines was visible. Among the magazines listed and on display were publications by Penthouse, Newlook, and Playboy. Certain photographs in each magazine had been

"tagged" by the task force to indicate that the magazine might be obscene.

Retailers were then provided a copy of the Alabama obscenity statute.[1] However, Evans also made an oral presentation that tended improperly to equate obscenity and sexual explicitness. That is, Evans stressed only one element of obscenity—depiction of "sexual conduct." *See* 1975 Alabama Code § 13A–12–150(4). He did not emphasize two other elements—that obscenity can be found only when (1) a given magazine, taken as a whole, and viewed from the perspective of contemporary community standards, appeals to the prurient interest and (2) when that magazine, taken as a whole, lacks serious literary, artistic, political, or scientific value. *See* § 13A–12–150(1)(a) and (c). Based on the district attorney's presentation, retailers reviewed only tagged photographs in magazines purchased from their store, expressed concern that entire magazines might be obscene, and asked Evans to indicate which magazines violated the law. Evans replied that he would make no explicit obscenity determinations because he "did not want to act as a censor." However, he did state that, in his opinion, most issues of Playboy and Playgirl were not obscene, and that several issues of Penthouse were "borderline."

Some retailers then announced that, as a "show of good faith," they would remove all adult magazines except for Playboy, Playgirl, and Penthouse from their stores. Many retailers later decided to make an extra showing of "good faith" by removing all sexually explicit magazines from sale. Consequently, the availability of Pent-house, Newlook, and Playboy publications declined significantly.

In a follow-up letter to the retailers in early January of 1986, Evans indicated that removal of sexually explicit magazines was "a good sign that a civil resolution to this issue is a very real and reachable objective." He strongly suggested, however, that criminal prosecutions would still follow, unless written consent decrees were finalized, by stating that "time [was] of the essence" and that the February grand jury session was "less than a month away."

Evans distributed copies of his proposed consent decree at a second meeting with the retailers on February 25, 1986. The proposed decree would incorporate a stipulation that certain adult magazines displayed at the December 20 meeting are "obscene." However, the decree improperly equates obscenity with sexual explicitness—that is, obscenity is again defined solely as the depiction of "sexual conduct." Among the magazines thus listed as "obscene" are several publications by Penthouse and Newlook. While the decree does not specifically list Playboy as "obscene," it does ban the sale of any publication "having a tendency, likelihood or propensity" towards obscenity. The decree would also ban future issues of listed magazines with the "same or similar title." Evans explained that any suggested changes to the proposed decree must be submitted to this office by March 18, and it was clear that he would take appropriate action based on the retailers' responses. At the close of that meeting, he instructed his staff to log the entire matter onto the next grand jury. In a follow-up letter reviewing

1. 1975 Alabama Code § 13A–12–151 criminalizes the sale and distribution of obscene works. Section 13A–12–150(1) provides that a work or performance is "obscene" when:

a. To the average person, applying contemporary community standards, the work or performance, taken as a whole, appeals to the prurient interest, and

b. The work or performance depicts or describes, in a patently offensive way, sexual conduct, actual or simulated, normal or perverted; and

c. The work or performance, taken as a whole, lacks serious literary, artistic, political or scientific value.

Section 13A–12–150(4) defines "sexual conduct" as (a) any act of masturbation, urination, defecation, sado-masochistic abuse, sexual intercourse or any other physical contact with a person's unclothed genitals, pubic area, buttocks or the breast or breasts of a female, whether alone or between members of the same or opposite sex or between a human and an animal, in an apparent act of sexual stimulation, gratification or perversion; or (b) lewd exhibition of the genitals.

both the December 20 and February 25 meetings, Evans's special assistant Kotouc found it necessary to clarify that "no threats were made" at either meeting.

At least three retailers signed and returned the proposed consent decrees, without revision, before the March 18 deadline. Several others expressed a desire to enter into such agreements. One retailer, however, indirectly resisted Evans's actions by forwarding both the list displayed at the December 20 meeting and the proposed consent decree distributed at the February 25 meeting, to Playboy. This lawsuit alleging that Evans and the task force had engaged in a "prior restraint" followed on March 17, 1986.

After this lawsuit was filed, Evans decided that he would not finalize any civil consent decrees until the prior restraint issue raised by the plaintiffs had been resolved. Evans did, however, initiate criminal grand jury proceedings, and designated the local merchants, including the local distributor, plus Penthouse, Newlook, and Playboy as targets.

On April 9, 1986, the plaintiff national publishers and trade associations filed an application for preliminary injunction, claiming that Evans had instituted criminal proceedings against them and the local merchants in retaliation for their having filed this lawsuit and that he had issued grand jury subpoenas as a part of his retaliation. They sought to have the court enjoin the issuance of the subpoenas, but not the criminal proceedings. Hearings on that application were held on April 15, 16, and 28. Based on the evidence then before it, the court concluded that preliminary injunctive relief was not warranted.

On May 15, 1986, with full knowledge that retaliation was an issue in this lawsuit, Evans and Kotouc spoke at a public meeting held by the Montgomery chapter of the National Federation of Decency. At that meeting, the district attorney publicly criticized the plaintiffs, the American Civil Liberties Union (ACLU), and the ACLU's "high powered lawyers" for blocking his efforts to stop pornography in Montgomery County. He insinuated that the ACLU had asked plaintiff McCaffery to move from Virginia to Montgomery for the express purpose of serving as a plaintiff in this lawsuit. The Federation's local president, the Reverend Larry G. Magnum, then announced that he had written a letter to McCaffery's employer, the Capri Theatre, threatening to initiate a boycott of the theatre because of McCaffery's "activity in pornography." Evans knew in advance that the letter would be sent, and the letter attached a transcript of testimony given by McCaffery in this case. During a question and answer period at the May 15 meeting, Evans and Kotouc endorsed any further actions the Federation might take to strengthen their joint campaign against pornography.

On May 19, 1986, the national publishers and trade associations amended their lawsuit to add the claim that Evans and his task force had initiated criminal proceedings against them and the local merchants in retaliation for their having brought this lawsuit. This cause is now before the court on the evidence submitted at the hearings on the preliminary injunction application and additional evidence submitted at a May 23, 1986, final hearing on the merits.[2]

## II.

It is now firmly established that obscene materials are beyond the protection of the first amendment and may therefore be regulated by the states. *McKinney v. Alabama*, 424 U.S. 669, 673, 96 S.Ct. 1189, 1193, 47 L.Ed.2d 387 (1976). It is equally well established, however, "that the proce-

---

**2.** The court recognizes that the factual findings it makes today differ in some measure from the findings made after the hearing on the plaintiffs' preliminary injunction application. However, the findings on the preliminary injunction application were just that—preliminary. After close reconsideration of the preliminary injunction evidence and consideration of the new evidence presented, the court is firmly convinced that any changes in its factual findings are warranted.

dures by which a State ascertains whether certain materials are obscene must be ones which ensure 'the necessary sensitivity to freedom of expression.' " *Id.,* 424 U.S. at 674, 96 S.Ct. at 1193, *quoting Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965). Constitutionally protected expression "is often separated from obscenity only by a dim and uncertain line." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 66, 83 S.Ct. 631, 637, 9 L.Ed.2d 584 (1963). Because applying the definition of obscenity to the facts of a given case is often a difficult and elusive task, "the risks of freewheeling censorship are formidable." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975). A state is therefore "not free to adopt whatever procedures it pleases for dealing with obscenity ... without regard to the possible consequences for constitutionally protected speech." *Bantam Books,* 372 U.S. at 66, 83 S.Ct. at 637, *quoting Marcus v. Search Warrant,* 367 U.S. 717, 731, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961); rather, the first amendment requires "that regulations of obscenity scrupulously embody the most rigorous procedural safeguards." *Id.*

The Supreme Court has therefore held that a valid final restraint on expression may occur only after "a judicial determination in an adversary proceeding." *Southeastern Promotions,* 420 U.S. at 559–60, 95 S.Ct. at 1247. It has also recognized, however, that a restraint prior to judicial review may sometimes also be warranted. But, because the risks of freewheeling censorship are much more formidible where the restraint precedes rather than follows a judicial determination, the Court has tolerated a system of prior restraint only where it meets the following strict and narrow safeguards:

> *First,* the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. *Second,* any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo.

> *Third,* a prompt final judicial determination must be assured.

*Id.,* at 560, 95 S.Ct. at 1247 (emphasis in original).

Here, the plaintiffs claim that the efforts of Evans and his task force to censor magazines they personally believed to be offensive violated the preceding constitutional principles. They charge that Evans set up an informal scheme of prior restraint, void of the rigorous procedural safeguards required by the constitution. The plaintiff national publishers and trade associations further claim that Evans and his task force have now initiated criminal proceedings against them and their local distributor and retailers in retaliation for their having brought this lawsuit · charging prior restraint.

### III.

The defendants contend, first, that the plaintiffs lack standing to challenge the actions of Evans and his staff. They assert that Penthouse, Newlook, and Playboy, the two trade associations, and McCaffery do not have a sufficient stake in the controversy to invoke the powers of this court. The court disagrees.

The concept of standing addresses "whether the litigant is entitled to have the court decide the merits of the dispute or of the particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). It derives from the requirement of Article III of the Constitution that federal courts are confined to adjudicating only an actual "case or controversy" between parties. Each plaintiff " 'must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant'; *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and that the injury 'is likely to be redressed by a favorable decision'; *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)." *Heckler v. Mathews,* 465 U.S. 728, 737, 104 S.Ct. 1387, 1394, 79

L.Ed.2d 646 (1984). The injury alleged must be "distinct and palpable" and must be "fairly traceable to the challenged action...." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984) (citations omitted). While these principles do not "make application of the constitutional standing requirement a mechanical exercise," *id.*, the Supreme Court has identified three critical factors that should be considered in all cases: first, whether the injury is "too abstract, or otherwise not appropriate, to be considered judicially cognizable," *id.*, second, whether "the line of causation between the illegal conduct and injury [is] too attenuated," *id.*, and third, whether "the prospect of obtaining relief from the injury as a result of a favorable ruling [is] too speculative." *Id.*

In addition to these constitutionally based concepts, the "[s]tanding doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights...." *Id.* at 751, 104 S.Ct. at 3324–3325.

Because the plaintiffs raise two discrete claims in this lawsuit, the court will address the standing issues for each in turn.

### A.

█ The plaintiffs have clearly satisfied all constitutional prerequisites for standing on their prior restraint claim. Playboy, Penthouse and Newlook enjoy the judicially recognized right to publish and circulate magazines without being subject to an unlawful prior restraint. *Bantam Books*, 372 U.S. at 64 n. 6, 83 S.Ct. at 636 n. 6; *see also Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) (first amendment necessarily protects both publication and distribution of printed materials). Consequently, the two trade associations, on behalf of their members, also enjoy the right to circulate magazines without being subject to an unlawful prior restraint. Finally, McCaffery enjoys a first amendment right to purchase and read magazines that have not been subject to an unlawful prior restraint, as long as there is someone willing to publish and circulate the magazines. *Virginia Pharmacy Board v. Consumer Council*, 425 U.S. 748, 756–757, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976) (assuming there is a willing speaker, the first amendment protects both the source and recipient of communications); *Procunier v. Martinez*, 416 U.S. 396, 408–409, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974) (same). Thus, each plaintiff asserts a judicially cognizable right.

Each of the plaintiffs has also demonstrated both actual and threatened injury to these rights. The defendants contend that no actual or threatened injury can be shown because none of the plaintiffs holds title to any of the magazines, and because there has been no proof of economic harm. Both of these arguments must be rejected. First, the interest that publishers and distributors possess in freely disseminating magazines survives the transfer of title. "The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication." *Bantam Books*, 372 U.S. at 64 n. 6, 83 S.Ct. at 636 n. 6. In fact, in *Bantam Books* a publisher was held to have suffered actual injury even though title to the books had long been transferred to local retailers. *Id.* Thus, when a system of informal prior restraint restricts the flow of presumptively protected materials along a chain of distribution, all persons along that chain are affected. Here, the national publishers, national trade associations, and the local reader all share a core interest in the free flow of magazines along that chain of distribution. Any interruption of that flow harms each. Second, the total impact of an action on protected speech, and not merely economic harm, is the touchstone for measuring injury in first amendment cases. *Cf. Young v. American Mini Theatres*, 427 U.S. 50, 78, 96 S.Ct. 2440, 2456, 49 L.Ed.2d 310 (1976) (Powell, J., concurring) (economic harm resulting from zoning ordinance not dispositive, where overall restriction on protected speech was minimal).

Here, the availability in Montgomery County of magazines containing sexually explicit matter declined significantly after Evans's December 20 meeting. Even if this decline in availability translated into negligible economic harm for the national publishers and the trade association members, the magazines have clearly been suppressed in Montgomery without any judicial determination of their obscenity. Under the first amendment, this unlawful suppression alone amounts to actual injury. Similarly, the threatened injury—unlawful suppression, in Montgomery, of future issues of magazines—would be cognizable regardless of overall economic impact.

The defendants next argue that any actual or threatened injury to the plaintiffs is not causally related to Evans's actions. The court does not agree. With respect to actual injury, the defendants contend that local retailers decided to remove sexually explicit publications from their shelves before any consent decrees were signed, and without reference to his actions. They contend that the local merchants acted independently, and were merely reacting to similar decisions by national chain stores to remove such magazines from sale. However, the local merchants in this case decided to remove magazines long before any national chainstores did. Moreover, they specifically told Evans at the December 20 meeting that they had decided to remove the magazines in response to his presentation and as a "show of good faith." Actual injury to the plaintiffs is therefore "fairly traceable" to actions by the district attorney. As to threatened injury, the defendants contend that his proposed consent decree does not refer to Playboy, Penthouse, or Newlook publications, and that suppression of these magazines is not contemplated. However, both Penthouse and Newlook publications are expressly listed, and the decree would suppress all future publications "of the same or similar title." Moreover, since the decree would also ban any magazine having a tendency toward obscenity, Playboy would be brought within its scope. Threatened injury to each of the plaintiff national publishers is there-

fore "fairly traceable" to actions by Evans. Moreover, injury to the plaintiff national trade associations, who would otherwise circulate those magazines in Montgomery, and injury to McCaffery, who would otherwise purchase and read those magazines in Montgomery, is also established.

Finally, the relief requested is likely to redress any actual and threatened injury to first amendment freedoms raised by the plaintiffs. The precise injury alleged is unlawful prior restraint on the distribution and sale of sexually explicit magazines. That injury would indeed be remedied by a declaratory judgment stating that Evans's actions imposed an unlawful prior restraint on the sale of such magazines and an injunction halting his efforts to coerce and extort self-censorship from local merchants. These remedies, of course, would not ensure that the distributor or any of the retailers would choose to resume trade in sexually explicit magazines. However, such relief would ensure that the decision whether to do so would be made free of coercion and without prior restraint.

The defendants contend that even if the constitutional prerequisites for standing have been met, self-imposed judicial policies counseling restraint when one litigant raises the legal rights of another are implicated here. They first argue that the two trade associations lack standing because they are raising their "mere interest in a problem" and do not represent aggrieved persons. *See Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). However, to the contrary, each trade association represents the interests of members who have suffered a distinct and palpable injury resulting from Evans's prior restraint. "It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review." *Id.; see also Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 342–345, 97 S.Ct. 2434, 2440–2442, 53 L.Ed.2d 383 (1977).

The defendants next argue that the only actions taken in this case have been taken

against local merchants, and that the plaintiff national publishers and trade associations are nothing more than third party bystanders raising the rights of others. However, because a system of informal prior restraint restricts the flow of presumptively protected materials along a chain of distribution, both prudence and policy favor conferring standing upon those persons who have a sufficient interest in being free of the restraint to raise a challenge, even if the restraint was not imposed directly upon them. This rule recognizes that all entities along a chain of distribution are affected by a prior restraint, and that those who are prevented "from selling a few titles" are "not likely to sustain sufficient economic injury to induce [them] to seek vindication of [their] rights." *Bantam Books*, 372 U.S. at 64 n. 6, 83 S.Ct. at 636 n. 6. Because the national publishers and trade associations in this case have been harmed by the prior restraint, and because they have a much stronger interest in challenging it than do the local merchants, their standing cannot be challenged. *Id.*

Finally, the defendants advance a similar argument with respect to McCaffery. Relying on *Frissell v. Rizzo*, 597 F.2d 840 (3rd Cir.1979), *cert. denied*, 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979), they contend that McCaffery should not be granted standing as a reader of sexually explicit magazines because the local merchants have not been barred from bringing their own challenge. This argument is meritless. In *Virginia Pharmacy Board*, 425 U.S. at 756, 96 S.Ct. at 1823, the Supreme Court stated that "[f]reedom of speech presupposes a willing speaker. But where a speaker exists, as in the case here, the protection is afforded to the communication, to its source and recipients both." *Frissell* extended this language, stating that recipients of protected speech have standing to challenge restraint on speech

only if the speaker is precluded from making the challenge. 597 F.2d at 848–49. Thus, according to *Frissell*, a recipient of protected speech would have standing only if there is a willing speaker and the speaker is precluded from making the challenge. Assuming *Frissell* is correct, the court is convinced that McCaffery still has standing.[3] First, there is a "willing speaker." The national publishers fully intend to continue publishing the types of magazines McCaffery wishes to read; and the court is not convinced at this time that, absent the alleged prior restraint by Evans and the task force, local merchants would not resume selling the magazines. Second, focusing on the local merchants only, the court is convinced that, for economic reasons, they are effectively precluded from bringing their own challenge; as the court has already found, the local merchants have little economic incentive to bring such a challenge. In *Frissell*, the appellate court recognized that a speaker's lack of economic incentive for challenging an act could serve as a basis for concluding that the speaker was, in effect, precluded from challenging the act. 597 F.2d at 849.

Based on the foregoing, the court concludes that each of the plaintiffs has standing to challenge Evans and his task force's prior restraint.

### B.

The plaintiffs have also met the constitutional prerequisites for standing to assert their retaliation claims. The courts have recognized that government officials may not institute criminal prosecutions against a person in retaliation for his exercise of first amendment rights. Thus, if, as alleged, Evan's decision to institute grand jury proceedings was motivated by such an impermissible purpose, actual injury would be established; the injury would be directly traceable to Evan's actions; and

---

**3.** Moreover, for the reasons stated by the new Fifth Circuit in *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1211 n. 4 (5th Cir.1982), this court disagrees with *Frissell's* extension of *Virginia Pharmacy Board*, and agrees that the Su-

preme Court's "holding on consumer standing may not be limited to situations in which the speaker is prevented from raising the First Amendment question." 682 F.2d at 1211 n. 4.

an injunction barring Evans from pursuing retaliatory criminal proceedings would redress the injury alleged.

Nor should the court deny standing on prudential grounds. To the extent that the plaintiff national publishers and members of the trade associations are now themselves targets of Evans's grand jury proceedings, they plainly assert their own rights. Moreover, while the plaintiff publishers and trade associations also challenge Evan's decision to target local merchants, none is a mere third party proxy arguing another party's rights. Each of the publishers and trade associations alleges that Evans has instituted grand jury proceedings against local merchants in order to sever critical links in a national distribution chain. Since the publishers and trade associations are themselves part of that chain, they assert their own rights, and not merely the rights of others. The court is not under the impression that the plaintiffs now press McCaffery's standing to raise the retaliation claim, and the court sees no need to reach that difficult issue at this time.

Based on the foregoing, the court concludes that the plaintiff publishers and trade associations have standing to raise the retaliation claim.

### IV.

The court must next determine whether Evans and his task force's actions did, in fact, impose an unlawful system of prior restraint on the distribution and sale of magazines. Since, as already indicated, prior restraints are not unconstitutional per se, *Bantam Books*, 372 U.S. at 70 n. 10, 83 S.Ct. at 639 n. 10, that inquiry subsumes two questions: first, whether Evans and his task force's actions constituted prior restraint, and, second, whether that prior restraint was unlawful.

### A.

The controlling case as to the existence of prior restraint is *Bantam Books*. There, a state commission was charged with educating the public about "obscene,

indecent, or impure" publications. 372 U.S. at 59, 83 S.Ct. at 633. It was also required to investigate and recommend prosecution of all persons selling such materials. *Id.* at 59–60, 83 S.Ct. at 633. The commission notified distributors, on official letterhead, that certain publications had been declared "completely objectionable" by a majority of its members, *id.* at 61, 83 S.Ct. at 634; that a list of those objectionable publications had been compiled, *id.* at 62–63 & n. 5, 83 S.Ct. at 635 & n. 5; that copies of the list had been provided to local police chiefs statewide; and that "[c]ooperative action will eliminate the necessity of our recommending prosecution to the Attorney General's department." *Id.* Compliance by distributors was monitored, in turn, by local police officials. The distributors reacted to the notice and monitoring procedures by refusing to fill new and pending orders for listed publications, retrieving unsold copies from retailers, and returning unsold copies to publishers. These actions were taken to avoid criminal prosecution. *Id.*

The Supreme Court held that the commission's actions, though intended as a good faith effort to secure resolution of a problem without formally invoking the criminal process, constituted an informal system of prior restraint, "a scheme of state censorship effectuated by extralegal sanctions." *Id.* at 72, 83 S.Ct. at 640. The Court was careful to note that informal contacts "genuinely undertaken" to provide "fair legal advice" about compliance with obscenity laws would not constitute a prior restraint. *Id.* The Court concluded, however, that the commission had gone "far beyond advising the distributors of their legal rights and liabilities" and had, in fact, acted "not to advise but to suppress." *Id.* Several factors contributed to the Court's conclusion. First, the commission's purported requests for "cooperation" were in fact "thinly veiled threats to institute criminal proceedings" and thus were virtual orders to stop selling the listed publications. *Id.* at 68, 83 S.Ct. at 638. As the Court noted, "People do not lightly disregard pub-

lic officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." *Id.* Second, the commission had the duty and ability to enforce its threats through official recommendations for prosecution. *Id.* at 60, 83 S.Ct. at 633. Third, the commission's actions were directed toward those "not likely to sustain sufficient economic injury to induce [them] to seek judicial vindication of [their] rights." *Id.* at 64 n. 6, 83 S.Ct. at 636 n. 6. Fourth, the commission had issued a "blacklist" of objectionable publications. *Id.* at 62–63 & n. 5, 83 S.Ct. at 635 & n. 5. Fifth, distributors knew that the commission was monitoring compliance with its communications. Sixth, distributors complied in order to avoid criminal prosecution. *Id.* And Seventh, the net result was suppression of blacklisted materials through "instruments of regulation independent of the laws against obscenity." *Id.* at 69, 83 S.Ct. at 638.

Throughout, the Supreme Court emphasized the critical importance of "look[ing] through forms to the substance" to determine whether a decision to withdraw publications from sale was voluntary or involuntary. *Id.* at 67, 83 S.Ct. at 637–638. The lower courts have consistently followed this approach. *See, e.g., Penthouse International, Ltd. v. McAuliffe,* 610 F.2d 1353, 1360 (5th Cir.), *cert. dismissed,* 447 U.S. 931, 100 S.Ct. 3031, 65 L.Ed.2d 1131 (1980) (calculated scheme of warrantless arrests and harrassing visits by prosecutor forced involuntary self-censorship by distributor); *see also R.C. Maxwell Co. v. Borough of New Hope,* 735 F.2d 85, 88 (3d Cir.1984) (quantum of governmental authority brought to bear against decisionmaker not sufficient to provoke self-censorship); *Hammerhead Enterprises, Inc. v. Brezenoff,* 707 F.2d 33, 39 (2d Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983) (court must "draw fine lines between permissible expressions of personal opinion and implied threats to employ coercive state power to stifle protected speech"); *Drive In Theatres, Inc. v. Huskey,* 435 F.2d 228 (4th Cir.1970) (sheriff's informal censorship, however well intended, consti-

tuted prior restraint); *ACLU v. City of Pittsburgh,* 586 F.Supp. 417, 421–423 (W.D. Pa.1984) (mayor's threat to employ massive sweep of newsstands and to initiate criminal prosecutions foreclosed voluntary choice); *Anti-Defamation League v. F.C.C.,* 403 F.2d 169, 172 (D.C.Cir.1968), *cert. denied,* 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969) (government commission's emphasis on "responsibility" was "simply a euphemism for self-censorship" and an "attempt to shift the onus of action against speech from the Commission to the broadcaster").

The only difference between the unlawful censorship action in *Bantam Books* and the censorship activity by Evans and his task force is that Evans was less subtle and his threats of criminal prosecution more direct. Evans steadfastly maintains that he sought at all times only voluntary cooperation. However, his words and deeds avow a calculated scheme to provoke retreat by those who dared to sell sexually explicit magazines. Indeed, the quantum of coercive state power brought to bear against the retailers in this case was quite formidable. Evans's "invitation" to the December 20 meeting went out on official letterhead. His "request" that retailers confirm their attendance at that meeting indicated from the outset that all responses to his official overtures would be closely monitored. Evans's blunt reference to the district attorney's "right and power" to compel their attendance, should that become necessary, sent a clear signal that resistance or objection would invoke a firm response. The December 20 and February 25 meetings were held not at some neutral location, where free choice would be fostered, but in a courtroom at the county courthouse, where implied threats of prosecution would have maximum impact. Magazines, treated as fruits of a criminal investigation and evidence of criminal activity, were brandished about to punctuate the risk of prosecution. The words "grand jury" and "indictment" permeated all presentations. Those selected to "cooperate" were those least likely to resist—local mer-

chants with little or no economic interest in selling the publications under attack. Evans, far from providing "fair legal advice" to the retailers, deliberately distorted the dividing line between obscenity and protected expression by equating sexual explicitness with illegal obscenity. A blacklist of the suspect publications was available for all to inspect, and local merchants, all law-abiding citizens, reacted by immediately removing any magazine that might conceivably lead to criminal prosecution. As the threat of criminal prosecution continued, they also promised to sign a consent decree that would bar any future sales of magazines that had not even been published.

It would simply defy reality to conclude, on these facts, that Evans acted only to inform and not to suppress. While Evans repeatedly stated in testimony before this court that he sought only voluntary cooperation, the court finds his testimony completely unworthy of credence. Viewed in the overall context of his actions, such disclaimers must be viewed as nothing more than cynical and evasive rationalizations for illegal conduct. It is clear that the circumstances created by Evans and his task force were inherently coercive, and were so intended, and went far beyond providing fair legal advice. In fact, the letter by Kotouc denying that any threats had been made implicitly recognized this harsh reality.[4]

Admittedly, the perpetrator of the prior restraint here is a prosecutor rather than a regulatory commission as was the case in *Bantam Books*. This is a distinction without real significance. The Supreme Court in *Bantam Books* was careful to note, replete with citations, that "[t]hreats of prosecution ... on the part of chiefs of police and prosecutors have been enjoined in a number of cases," 372 U.S. at 67 n. 8, 83 S.Ct. at 638 n. 8, and the Court closed its opinion by specifically indicating that its holding would apply to "private consultation between law enforcement officers and

distributors." *Id.* at 71, 83 S.Ct. at 640. It is thus clear that the same standard for assessing coercion applies here. *See Penthouse International v. McAuliffe*, 610 F.2d at 1360 (applying *Bantam Books* to informal censorship by prosecutor); *see also Drive In Theatres*, 435 F.2d at 230 (applying *Bantam Books* to informal censorship by sheriff).

The plaintiffs have therefore established that Evans and his task force have intentionally imposed, and threaten to perpetuate, an informal system of prior restraint on the distribution and sale of sexually explicit magazines.

### B.

The next issue for the court is whether the prior restraint imposed by Evans and his task force is unlawful. The Supreme Court has cautioned that any prior restraint on allegedly obscene material must be subject to "a heavy presumption against its constitutional validity." *Bantam Books*, 372 U.S. at 70, 83 S.Ct. at 639. The defendants contend that, because Evans would have presented the proposed consent decree to a state judge for approval, the prior restraint at issue here meets one of the constitutional requirements for such restraints—a prompt judicial determination of obscenity in an adversary proceeding. *Southeastern Promotions*, 420 U.S. at 560, 95 S.Ct. at 1247. They maintain that this provision for review of the decree by a state judge overcomes any presumption of unconstitutionality. The defendants' contention totally misses the mark.

Under the prior restraint scheme orchestrated by Evans, the local merchants believed they risked criminal prosecution if they failed to cooperate. Evans knew and intended that, with this potent threat of prosecution, the merchants would promptly remove all magazines that might conceivably be objectionable to him and the task force and that merchants would have fallen into line long before any consent decree

---

**4.** Some local merchants testified that Evans did not threaten them, and that they acted voluntarily. However, these merchants were called by Evans himself, and, given the circumstances, the court finds their testimony unreliable.

was presented to a state judge. The prior restraint on magazines thus removed would have had its intended broad and final effect long before any state judge might pass on the consent decree. Indeed, this is just what happened. The consent decree, in this respect, would merely serve as added assurance that the suppression of those particular magazines would remain final.

Moreover, Evans has presented no evidence that the state judge would be called on to determine whether all the magazines specifically listed in the decree were obscene. Indeed, the consent decree does not provide for actual review of the magazines themselves. Nor is there any indication that the judge would ever determine whether magazines that were taken off the shelves but not listed in the consent decree were obscene. There is thus no evidence that the nominal presence of a state judge in this scheme would assure the protection of non-obscene magazines. Furthermore, it is clear that Evans's scheme is unconstitutional to the extent it sought, through the consent decree, to suppress future magazines that merely had a "tendency" toward obscenity. By definition, such magazines would not be obscene and their suppression would thus be unconstitutional. It is also clear that his scheme ran afoul of the constitution when he sought to suppress, again by use of the consent decree, all future issues of specific magazine titles. It is impossible for anyone, including a judge, to determine whether magazine issues that have not yet been published are obscene. Such a flat ban on future publications that could well fall within the protection of the first amendment is patently prohibited. *Cf. Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980) (per curiam) (injunction against the future exhibition of unnamed films that depict particular acts enumerated in the state's obscenity statute rejected). And finally, Evans does not even contend that his scheme meets the other requirements for a constitutional prior restraint set forth in *Southeastern Promotions*. There is no evidence that the prior restraint would be imposed for a spec-

ified brief period or that it would only be imposed to preserve the status quo. 420 U.S. at 560, 95 S.Ct. at 1247.

■ Evans's scheme of prior restraint is unquestionably unconstitutional and illegal.

## V.

The court will finally address the contention of the national publishers and the trade associations that Evans and the task force have initiated state criminal proceedings against them and their local merchants in retaliation for their having filed this lawsuit.

The Supreme Court has formulated a "strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 431, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). This policy is especially applicable when a plaintiff seeks to enjoin an ongoing state criminal proceeding. *Younger v. Harris*, 401 U.S. 37, 45, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1971).

*Younger* and its progeny make clear that, before a federal court may enjoin an ongoing state criminal proceeding, the plaintiff must demonstrate that the threatened harm would be immediate and "egregious." *Wichert v. Walter*, 606 F.Supp. 1516, 1519 (D.N.J.1985) (Sarokin, J.). This policy of nonintervention is based on two principles. The first is that "courts of equity should not act ... when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger*, 401 U.S. at 43, 91 S.Ct. at 750. The second is "the notion of 'comity,' that is, a proper respect for state functions." *Id.* However, when the prosecution itself is brought in bad faith, this policy of nonintervention does not apply. "[A] suit to enjoin a state criminal prosecution brought in bad faith is of a different breed than a suit to enjoin a prosecution brought lawfully and in good faith." *Wilson v. Thompson*, 593 F.2d 1375, 1382 (5th Cir.1979). This is so be-

cause "a showing of ... bad faith is equivalent to a showing of irreparable injury," *Shaw v. Garrison,* 467 F.2d 113, 120 (5th Cir.), *cert. denied,* 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972), and because the state "by definition does not have any legitimate interest in pursuing a bad faith prosecution...." *Wilson,* 593 F.2d at 1383. When the state's legal machinery is itself employed in bad faith to violate federal constitutional rights, irreparable harm occurs regardless of the outcome, and any justification for nonintervention based on comity disappears. *Id., quoting Sheridan v. Garrison,* 415 F.2d 699, 707 (5th Cir. 1969), *cert. denied,* 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed.2d 685 (1970).

Based on these principles, an exception to *Younger's* policy of nonintervention has been recognized when the state commences a prosecution "to retaliate for or to deter the exercise of constitutionally protected rights." *Wilson,* 593 F.2d at 1377. To secure a permanent injunction based on this exception, the plaintiffs must first establish by a preponderance of the evidence that their conduct was constitutionally protected. They must next demonstrate that retaliation was a "major motivating factor and played a prominent role in the decision to prosecute." *Smith v. Hightower,* 693 F.2d 359, 367 (5th Cir.1982) (Wisdom, J.). If the plaintiffs establish their case for retaliation, the burden then shifts to the defendant to prove by a preponderance of the evidence that it would have pursued good faith criminal proceedings even had the retaliatory purpose not been considered. *Wilson,* 593 F.2d at 1387; *see also Mount Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). In assessing all the evidence, however, the court must be guided by two critical policy considerations. The first is that "the State may have any number of legitimate reasons for responding to a civil lawsuit by bringing a criminal prosecution." *Wilson,* 593 F.2d at 1386. That is, the mere fact that a prosecution follows on the heels of protected conduct does not alone establish retaliation. "It is only when the state's

purpose in bringing criminal proceedings is to retaliate for or to deter the prosecution of the civil lawsuit that the plaintiff's constitutional rights are violated." *Id.* The second consideration is that exceptions to the *Younger* policy of nonintervention are indeed narrow. District courts should "not allow the ... retaliatory prosecution exception to the *Younger* doctrine to swallow the rule of that case." *Smith,* 693 F.2d at 375.

Here, the plaintiffs were obviously engaged in protected activity when they filed this lawsuit. *Wilson,* 593 F.2d at 1387. The court must therefore consider, first, whether the plaintiffs have established that retaliation against their exercise of first amendment rights was a major motivating factor and played a prominent role in Evans's decision to initiate grand jury proceedings against the plaintiff national publishers and trade associations, and the local merchants; and, second, whether Evans would have pursued good faith grand jury proceedings against the plaintiff national publishers and trade associations, and the local merchants, even had any retaliatory purpose not been considered.

The court concludes that the plaintiffs have met their threshold burden of demonstrating that retaliatory purpose was a major motivating factor in Evans's decision to institute grand jury proceedings. Evans took three different actions after this lawsuit was filed which provide compelling evidence of a purpose to retaliate against the plaintiffs for the exercise of their first amendment rights. First, while Evans from the outset preferred to resolve the pornography problem strictly on a local level, and expressly rejected the option of taking direct actions against national publishers or trade associations, those preferences were disregarded without explanation once the plaintiffs filed this lawsuit. Evans publicly denounced the plaintiff national publishers and trade associations and their "high powered lawyers" as outsiders who were interfering with local matters, and included them as additional targets of his grand jury proceedings. Evans has not

offered any non-retaliatory explanation for this change. Moreover, his open reference to the plaintiffs as outside troublemakers reveals that he targeted the plaintiff publishers and trade associations precisely because they had dared to challenge his actions. In short, retaliation played a major role in Evans's decision to move against the publishers and trade associations. Second, Evans continues to contend that bringing criminal proceedings against local merchants would be unfair. Given this contention, the court must conclude that Evans has now decided to institute criminal proceedings against local merchants because some other objective requires such action, even if unfairness to the merchants will result. It was Evans himself who acknowledged that criminal proceedings would indeed provide a highly effective method for deterring local merchants from selling the plaintiffs' publications. Absent any other explanation, the court must conclude that Evans has now decided to institute criminal proceedings against the merchants because, in so doing, he can disrupt the plaintiff's chain of distribution and deny the plaintiffs local outlets for their publications. Third, and finally, Evans's eager endorsement of retaliatory actions by others against plaintiff McCaffery suggests a readiness to engage in such activities himself. The foregoing inferences of retaliatory purpose are further buttressed by the poor demeanor of Evans and other task force members during testimony before this court. Their deliberate evasiveness was palpable, and left this court with the unmistakeable impression that retaliatory motive played a prominent role in their decisions.

Finally, "the strength of the evidence and seriousness of the charges should also be considered in determining if retaliation ... exists." *Smith*, 693 F.2d at 369. The court has carefully reviewed the magazines purchased by the task force. Of these, none of the issues of Playboy, Playgirl, Penthouse, Newlook, or Forum can be fairly categorized as obscene. The same is true for several issues of other magazines purchased by the task force. Thus, the strength of a substantial portion of the evidence collected by Evans is open to question. Moreover, the crime involved is a misdemeanor, and it is manifest from Evans's prior strategy that he did not consider the crime "serious" enough to warrant prosecution in all cases. Evans's prior willingness to resolve the matter civilly betrays an admission that criminal prosecutions were not in all cases compulsory, and that other factors, including an intent to retaliate, could enter into the decision.

Given the court's conclusion that retaliatory purpose was a major motivating factor in Evans's decision to initiate the present grand jury proceedings, the burden now shifts to Evans to prove by a preponderance of the evidence that he "would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered." *Wilson*, 593 F.2d at 1387.

Whether Evans "would have reached the same decision" absent retaliatory motive must be evaluated with reference to the particular facts and circumstances of this case. Even if a different prosecutor in a different situation might reasonably have instituted good faith criminal proceedings, the court must here determine whether Evans himself would have reached the same conclusion in this case. As to the national publishers and trade associations, the evidence is clear that Evans would never have taken any action against them, and that his only reason for targetting them at this time is to retaliate against them for filing this lawsuit. As to the local merchants, it is manifest that, but for a desire to punish the national publishers by choking off their local distribution points, Evans would not have brought criminal prosecutions against local merchants. Evans has utterly failed to articulate any credible rationale for disregarding his strong aversion to such prosecutions. Evans attempts to explain this inconsistency by stating that his only recourse was to pursue criminal proceedings. However, his contention that prosecutions, no matter how distasteful, had to be brought because no other recourse was

left, does not withstand scrutiny. Nothing now prevents Evans from establishing the obscenity of each of the magazines sold in a civil nuisance trial. While Evans is, of course, foreclosed from executing and enforcing the civil consent decree at issue in this lawsuit, he is not foreclosed from actually litigating the issue of obscenity in a civil proceeding. Evans has yet to explain why he is now so reluctant to pursue his route of civil litigation, which he initially believed would be the fairest to everyone; why he is so eager to pursue the criminal route, which he initially condemned as unfair to the local merchants; and why he is so eager to pursue a resolution on a national level, a route he expressly rejected prior to this lawsuit. Evans's recourse to options that have an obvious retaliatory impact on the plaintiffs, coupled with statements indicating an intent to retaliate, leave this court with the firm impression that retaliation was a "but for" cause of Evans's actions.

## VI.

■ As victims of an illegal prior restraint and illegal retaliation, the plaintiffs are entitled to appropriate declaratory and injunctive relief. The court will therefore enter a judgment declaring that Evans and the task force have engaged in an illegal prior restraint against all plaintiffs and that they have illegally instituted criminal proceedings against the national publishers and trade associations and the local merchants. The court will also enjoin the defendants from pursuing the illegal prior restraint and from further pursuit of criminal proceedings against the national publishers and trade associations and the local merchants for actions occurring prior to the filing of this lawsuit and based on the magazines that are the subject of this lawsuit. The national publishers and trade associations do not seek to prevent the district attorney and his task force from pursuing criminal prosecutions for any illegal conduct occurring after this lawsuit was filed.

## VII.

Before concluding this memorandum opinion, the court is compelled to make some additional comments. As already stated, the district attorney may still challenge in a civil proceeding any conduct of the national publishers and trade associations and the local merchants, occurring before this lawsuit was filed, that he believes to be constitutionally unprotected. Indeed, the evidence reflects that Evans always intended to challenge such conduct by use of the civil process exclusively. The district attorney may also pursue both criminal and civil sanctions against the national publishers and trade associations and the local merchants for illegal conduct occurring after this lawsuit was filed. Thus, Evans and his task force may still effectively pursue their plan to eliminate obscenity in Montgomery County.

However, in so doing, the district attorney and his task force may not censor erotic or sexually explicit magazines that are not obscene. The law does not equate the erotic and sexually explicit with the obscene; to be sure, absent evidence that they are obscene, exotic and sexually explicit materials fully enjoy the protection of the first amendment. It is a hallmark of our free society that speech protected by the first amendment shall not be stifled, even when some find that speech offensive or undesirable. While some might prefer to ban all public discourse about matters sexual, the government has no role to play in forcing that vision on those who hold contrary views. Thus, in proceeding either civilly or criminally to eliminate obscenity, the district attorney and his task force must pay homage to the first amendment and adopt procedures to assure that constitutionally protected speech does not also fall within their censure.

An appropriate judgment will be entered.