SKYYWALKER RECORDS, INC.; Luther Campbell; Mark Ross; David Hobbs; and Chris Wongwon, Plaintiffs,

v.

Nicholas NAVARRO, Defendant.

No. 90–6220–CIV–JAG.

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

June 6, 1990.

Bruce Rogow, Ft. Lauderdale, Fla., Allen Jacobi, Jacobi & Jacobi, North Miami, Fla., for plaintiffs.

John W. Jolly, Jr., Shailer, Purdy & Jolly, P.A., Fort Lauderdale, Fla., for defendant.

## FINAL ORDER

GONZALEZ, District Judge.

This is a case between two ancient enemies: Anything Goes and Enough Already.

Justice Oliver Wendell Holmes, Jr. observed in *Schenck v. United States*, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919), that the First Amendment is not absolute and that it does not permit one to yell "Fire" in a crowded theater. Today, this court decides whether the First Amendment absolutely permits one to yell another "F" word anywhere in the community when combined with graphic sexual descriptions.

Two distinct and narrow issues are presented: whether the recording *As Nasty As They Wanna Be* (*Nasty*) is legally obscene; and second, whether the actions of the defendant Nicholas Navarro (Navarro), as Sheriff of Broward County, Florida, imposed an unconstitutional prior restaint upon the plaintiffs' right to free speech.

It is before the court following a trial on the merits held May 14 and May 15, 1990. The court has considered the pleadings, exhibits, the testimony of the witnesses, plus argument of able counsel. By the stipulation of the parties, the trial record also includes all evidence and argument presented at the plaintiffs' preliminary injunction hearing held April 19, 1990.

### THE PLAINTIFFS

The plaintiff Skyywalker Records, Inc. (Skyywalker) is a Florida corporation headquartered in Miami, Florida. The plaintiffs Luther Campbell, Mark Ross, David Hobbs, and Chris Wongwon, constitute the group known as "2 Live Crew" whose recording, *As Nasty As They Wanna Be*, is the subject of this lawsuit. Luther Campbell is also the President, Secretary, sole shareholder, and sole director of Skyywalker.

The plaintiffs have brought this action under section 1983, Title 42 of the United States Code, which provides a federal statutory remedy for unlawful deprivations of federal rights including those liberties guaranteed under the United States Constitution. The plaintiffs also seek a declaration of their legal rights, under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), and injunctive relief under section 2202(b) thereof. This court has previously denied the plaintiffs' motion for a preliminary injunction by *ore tenus* order entered April 19, 1990. There is no prayer for money damages.

Because this is a civil action, the party with the burden of proof must prevail by a preponderance of the evidence. On the issue of obscenity, the defendant Navarro has the burden of proof. As to the prior restraint claim, however, the plaintiffs have the burden to prove, beyond a preponderance of the evidence, that the defendant's actions were unconstitutional.

It must be emphasized at the outset that this decision does not criminalize the plaintiffs' conduct, nor does it charge anyone with a crime. That is a matter for the police and the criminal courts to determine. Whether the plaintiffs are guilty of a crime can only be decided if criminal charges are brought, a trial by jury conducted, and all other due process requirements have been met. Whether *As Nasty as They Wanna Be* is *criminally* obscene is left for the determination of another court on another day.

### THE FACTS

The recording *As Nasty As They Wanna Be* was released to the public by 2 Live Crew in 1989. To date, public sales have totalled approximately 1.7 million copies. The recording is available in various formats including phonograph records, cassette tapes, and compact discs. 2 Live Crew has also produced a recording entitled *As Clean As They Wanna Be* (*Clean*) which has sold approximately 250,000 copies. Although neither party introduced *Clean* into evidence, it apparently contains the same music as *Nasty* but without the explicit sexual lyrics.

In mid–February 1990, the Broward County Sheriff's office began an investigation of the *Nasty* recording. The investigation began in response to complaints by South Florida residents.

Broward County Deputy Sheriff Mark Wichner was assigned to the case. On February 26, 1990, he traveled to Sound Warehouse, a Broward County retail music store, and purchased a cassette tape copy of the *Nasty* recording. The tape was purchased from an open display rack marked "Rap Music", easily accessible to all of Sound Warehouse's customers regardless of age.

Deputy Wichner listened to the *Nasty* recording, had six of the eighteen songs transcribed, and prepared an affidavit detailing these facts requesting that the Broward County Circuit Court find probable cause that the *Nasty* recording was legally obscene. On February 28, 1990, Deputy Wichner submitted the affidavit, an attached transcript of the six songs, and the tape cassette of the *Nasty* recording to the duty judge of the Broward County Circuit Court, the Honorable Mel Grossman. The communications between Deputy Wichner and Judge Grossman were limited to the filing of the affidavit, transcript, and tape cassette. Several days later, Judge Grossman's chambers contacted the deputy and requested further information concerning the location in Sound Warehouse of the *Nasty* recording and its accessibility to the public. Deputy Wichner communicated that information to the judge.

On March 9, Judge Grossman issued an order after reviewing the *Nasty* recording "in its entirety." The judge explicitly found probable cause to believe this recording was obscene under section 847.011 of the Florida Statutes and under applicable case law.

The Broward County Sheriff's office received and copied the order, and distributed it county wide to retail establishments that might be selling the *Nasty* recording. It decided to "warn the stores as a matter of courtesy" rather than make an initial arrest because, according to Deputy Wichner's testimony, such conduct would have been overaggressive. The Sheriff's office has not opened any investigations of other musical recordings because of the absence of citizen complaints.

Thereafter, Deputy Wichner re-visited the store where he had purchased the original recording plus another Sound Warehouse outlet and a store called Uncle Sam's Records. On these visits, the deputy wore a jacket marked "Broward County Sheriff" and displayed his badge in plain view. He spoke with a manager in each of the three stores, provided them with a copy of Judge Grossman's order, and told them, in a friendly conversational tone, that they should refrain from selling the *Nasty* recording. The managers were warned that further sales would result in arrest and that if convicted, the penalty for selling to a minor was a felony, and a misdemeanor if sold to an adult. Between fifteen and twenty different Broward County stores were personally visited by the Sheriff's office, and the evidence indicates that each of the visits was conducted in the same manner as were Deputy Wichner's three stops.

The Sheriff's office warnings were very effective. Within days, all retail stores in Broward County ceased offering the *Nasty* recording for sale. Those stores not directly visited by deputy sheriffs pulled the recording from their shelves after hearing about the visits from television and radio reports. Some stores continued to sell the *Clean* recording. *Nasty* was no longer sold even by stores having a policy of specially marking the recording with a warning, and of not selling it to minors. 2 Live Crew also includes a small statement on the front of the paper insert to their recording, as follows: "WARNING: EXPLICIT LANGUAGE CONTAINED".

The Broward County Sheriff's office took no further action because there was no information that any store was selling the *Nasty* recording.

On March 16, 1990, the plaintiffs filed this action in federal district court. On March 27, 1990, Sheriff Nicholas Navarro filed an *in rem* proceeding in Broward County Circuit Court against the *Nasty* recording seeking a judicial determination that it was obscene under state law. *See Navarro v. The Recording "As Nasty As They Wanna Be"*, case number 90–09324(12) (Reasbeck). There is no evidence

of the status of the state case including whether a trial date has been set. No criminal proceedings against either the recording or the group 2 Live Crew have been instituted.

## OBSCENITY AND THE FIRST AMENDMENT

The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech." The Fourteenth Amendment declares that "[n]o State shall ... deprive any person of ... liberty ... without due process of law." It is now well-established that this "liberty" includes the right to free speech. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 570–71, 62 S.Ct. 766, 768–69, 86 L.Ed. 1031 (1942); *Roth v. United States*, 354 U.S. 476, 479–80, 77 S.Ct. 1304, 1305–06, 1 L.Ed.2d 1498 (1957); *Stanley v. Georgia*, 394 U.S. 557, 559, 89 S.Ct. 1243, 1244, 22 L.Ed.2d 542 (1969); *Miller v. California*, 413 U.S. 15, 20, 93 S.Ct. 2607, 2612, 37 L.Ed.2d 419 (1973). Hence, neither the federal nor the state governments may abridge this Constitutional right.

The First Amendment is one of our most sacred liberties since freedom of thought and speech are the key to the preservation of all other rights. Free speech plays a critical role in furthering self-government, in encouraging individual self-realization, and fostering society's search for truth via exposure to a "marketplace of ideas."

■ To protect that sacred right, the judiciary carefully scrutinizes government regulation to determine if such regulation impermissibly infringes upon it. When legislative or executive action is directed at the content of one's speech, it will pass judicial review only upon a showing that the action is designed to further a compelling governmental interest by narrowly drawn means necessary to achieve the end. *See, e.g., Widmar v. Vincent*, 454 U.S. 263, 270–71, 102 S.Ct. 269, 274–75, 70 L.Ed.2d 440 (1981).

■ The First Amendment's guaranty is not absolute, however. *See, e.g., Chaplin-sky*, 315 U.S. at 571, 62 S.Ct. at 769. Although the amendment is unconditional on its face, the fact that there were accepted state limits on speech at the time it was ratified indicates that the "phrasing of the First Amendment was not intended to protect every utterance." *Roth*, 354 U.S. at 483, 77 S.Ct. at 1308.

This is certainly true about speech on sexual subjects.

Obscene speech has *no* protection under the First Amendment. *See Sable Communications of California, Inc. v. FCC*, — U.S. ——, 109 S.Ct. 2829, 2835, 106 L.Ed.2d 93 (1989); *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 57, 93 S.Ct. 2628, 2635, 37 L.Ed.2d 446 (1973); *Miller*, 413 U.S. at 20, 93 S.Ct. at 2612; *Roth*, 354 U.S. at 483, 77 S.Ct. at 1308; *Chaplinsky*, 315 U.S. at 571–72, 62 S.Ct. at 768–69. The rationale is simple: the message conveyed by obscene speech is of such slight social value that it is always outweighed by the compelling interests of society, as manifested in the laws enacted by its elected representatives. *See, e.g., Chaplinsky*, 315 U.S. at 571–72, 62 S.Ct. at 768–69.

Sex has been called "a great and mysterious motive force in human life". *Roth*, 354 U.S. at 487, 77 S.Ct. at 1310. Because of its power, both federal and state governments have chosen to regulate its abuse. For example, states have banned prostitution, incest, rape, and other sexually related conduct. These prohibitions are no different than a ban on obscenity. The distinction between regulations of conduct and speech does not invalidate obscenity laws. As noted in *Miller v. California*, "Sex and nudity many not be exploited without limit by films and pictures exhibited or sold in places of public accomodation any more than live sex and nudity can be exhibited or sold without limit in such public places." 413 U.S. at 25–26, 93 S.Ct. at 2615–16.

The state may also have an important interest in protecting minors and unwilling or sensitive adults from exposure to obscene materials. *See Miller*, 413 U.S. at 18–19, 93 S.Ct. at 2611–12.

The plaintiffs attempt to diminish the state's interest by relying upon language in *Butler v. Michigan,* 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957), that if materials that are only obscene as to minors are banned, a state's statute would "reduce the adult population ... to reading only what is fit for children." *Id.* at 383, 77 S.Ct. at 525. This decision only applies, however, to governmental regulations of materials which are not obscene as to adult audiences. Certainly it is not improper for a state to protect children from materials which are too lewd for even adult consumption.

Words, including musical lyrics, are powerful. As noted in *Paris Adult Theatre I,*

[If there is a] well nigh universal belief that good books, plays, and art lift the spirit, improve the mind, enrich the human personality, and develop character, can we then say that a state legislature may not act on the corollary assumption that commerce in obscene books, or public exhibitions focused on obscene conduct, have a tendency to exert a corrupting and debasing impact leading to antisocial behavior? 413 U.S. at 63, 93 S.Ct. at 2638.

Even though there is no Constitutional protection for obscenity and there are potential governmental interests at stake, it does not necessarily mean that obscene speech is illegal. Indeed, state governments could legalize obscenity including use by consenting adults. *See, e.g., United States v. Twelve 200-Foot Reels of Super 8mm. Film,* 413 U.S. 123, 129, 93 S.Ct. 2665, 2669, 37 L.Ed.2d 500 (1973).

The government must first criminalize obscenity before it is outlawed. Indeed, if there were no statutory bans enacted by the legislature, courts would not have to decide what is and what is not obscene.

The U.S. Supreme Court discussed this in *United States v. Reidel,* 402 U.S. 351, 356–57, 91 S.Ct. 1410, 1412–13, 28 L.Ed.2d 813 (1971):

[C]ases have interpreted the First Amendment not to insulate obscenity from statutory regulation. But the Amendment itself neither proscribes

dealings in obscenity nor directs or suggests legislative oversight in this area. The relevant constitutional issues have arisen in the courts only because lawmakers having the exclusive legislative power have consistently insisted on making the distribution of obscenity a crime or otherwise regulating such materials and because the laws they pass are challenged as unconstitutional invasions of free speech and press.

■ The Florida Legislature *has* acted, however. It has enacted a statutory scheme outlawing obscenity. It is apparent that this legislation is intended to regulate obscenity to the maximum extent allowed by the Constitution of the United States. Section 847.001(7), Florida Statutes, tracks the language of the controlling case of *Miller v. California* in defining obscenity for purposes of the state ban. *Cf. A Book Named "John Cleland's Memoirs Of A Woman of Pleasure" v. Attorney General of Massachusetts (Memoirs),* 383 U.S. 413, 418, 86 S.Ct. 975, 977, 16 L.Ed.2d 1 (1966) (state statute interpreted by state's highest court as including all works "obscene in the constitutional sense").

The Florida Legislature has enacted a comprehensive set of laws. The primary provision is section 847.011 of the Florida Statutes. Subsection (1)(a) *criminalizes* the distribution, sale, or production of any obscene thing including a "recording" which can be "transmuted into auditory ... representations." Subsection (2) similarly makes it a *crime* for a person to knowingly have an obscene thing, including musical recordings, in his possession. Section 847.-06 and 847.07 make it *criminal* to transport obscenity into the state or to create, deliver, or publish obscenity. There are several provisions which specifically apply to child pornography. *See* FLA.STAT. ANN. §§ 847.012, .0125, .013, .0135, .0145 (Supp.1990). Finally, sections 847.201 and 847.202 prohibit obscene programming on cable television during promotional periods and require ratings on video tapes rented and sold to the public.

An argument underlying the plaintiffs' position is that the obscenity or non-obscenity of any material should not be a concern of the criminal law, but rather should be left to the free market of ideas. Let each individual member of the public decide whether they wish to buy the material. 2 Live Crew has labeled their work with an explicit warning. They claim this label allows adults who would object to the recording's contents to exercise the consumer's right of free choice to not buy the product. To use the example of television, if the viewer does not like what he sees on Channel X, he may switch to Channel Y or turn off the set. In the case of obscene music, people who do not want to listen to obscenity do not have to buy it.

This is the argument of those absolutists who believe *all speech, regardless of its content*, is protected by the First Amendment. Such individuals label all regulation of speech as "censorship" and "paternalism". This absolutist view finds strength among those who believe rugged individualism is a valued virtue, if not a protected right that everyone should be permitted to "do their own thing."

This is a facially appealing argument. The problem is that it is not the law.

Florida has declared obscenity to be a crime. To repeat, violation of the laws against obscenity is as much against the law as assault, rape, kidnapping, robbery, or any other form of behavior which the legislature has declared criminal.

The absolutists and other members of the party of Anything Goes should address their petitions to the Florida Legislature, not to this court. If they are sincere let them say what they actually mean—Lets' Legalize Obscenity!

To be redundant, obscenity is not a protected form of speech under the U.S. Constitution, with or without voluntary labeling. *It is a crime.* If the people of Florida, want to legalize obscenity, they have every right to do so. It is much easier to criticize the law, however, than it is to work to repeal it. As the Supreme Court stated in *Paris Adult Theatre I:*

It is argued that individual "free will" must govern, even in activities beyond the protection of the First Amendment and other constitutional guarantees of privacy, and that government cannot legitimately impede an individual's desire to see or acquire obscene plays, movies, and books. We do indeed base our society on certain assumptions that people have the capacity for free choice. Most exercises of individual free choice—those in politics, religion, and expression of ideas—are explicitly protected by the Constitution. Totally unlimited play for free will, however, is not allowed in our or any other society....

The States, of course, may follow ... a "laissez-faire" policy and drop all controls on commercialized obscenity, if that is what they prefer, just as they can ignore consumer protection in the marketplace, but nothing in the Constitution *compels* the States to do so with regard to matters falling within state jurisdiction. 413 U.S. at 63–64, 93 S.Ct. at 2638 (emphasis in original).

█ This court's role is merely to interpret the law to determine whether the particular material is obscene. If the inquiry yields an affirmative response, judicial review is limited to whether the means chosen to implement the law are rationally related to the goal of the legislation. It is not the role of this court to sit as a Super-Legislature to second-guess whether the best possible law was passed. *See Paris Adult Theatre I*, 413 U.S. at 64, 93 S.Ct. at 2638. This court must also refrain from substituting its own choice of the appropriate means to outlaw obscenity, for this is a matter of legislative discretion subject only to the boundaries of the Constitution and the conscience of the legislators. *See Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441, 77 S.Ct. 1325, 1327, 1 L.Ed.2d 1469 (1957). And if a statute only regulates unprotected obscenity, mere rationality is sufficient to satisfy due process.

In an era where the law and society are rightfully concerned with the rights of minorities, it should not be overlooked nor forgotten that majorities also have rights.

In our democratic form of government, citizens elect representatives to protect their interests and promote their welfare. State legislatures have the authority to exercise the governmental police power which reaches all manner of human conduct. As already seen, state regulation may reach some of the most intimate aspects of man's existence including sex. *Also see Paris Adult Theatre I,* 413 U.S. at 68–69, 93 S.Ct. at 2641–42 ("Commercial exploitation of depictions, descriptions, or exhibitions of obscene conduct on commercial premises open to the adult public falls within a State's broad power to regulate commerce and protect the public environment."). When man enters into a society and becomes a member thereof, he necessarily submits to its laws and thereby must give up the unfettered liberty he would otherwise possess in his natural state. *See Near v. Minnesota,* 283 U.S. 697, 707, 51 S.Ct. 625, 627, 75 L.Ed. 1357 (1931).

In sum, if persons subscribe to the view that obscenity should be legalized, they should take their petitions to Tallahassee, the Florida capital, not to the steps of the U.S. courthouse.

The people of Florida have made obscenity a crime. Individuals are not free to disobey or disregard the law. The law is not a smorgasbord where people are free to pick and choose among which laws they will obey and which they will reject. Neither is it a channel selector available to every member of the public to use as they deem fit. As noted in the Pattern Instructions of the Eleventh Circuit, jurors in deciding the rights and liberties of their fellow citizens "must ... follow the law ... whether.... [they] agree with that law or not."

Men and women in good faith may agree or disagree as to whether obscenity should be prohibited. They can argue that the obscenity statutes should or should not be repealed. In the meantime, however, the law must be obeyed and the Sheriff has a duty to enforce it. Indeed, Florida's Legislature has mandated that all sheriffs in the state are to "vigorously enforce" the obscenity laws. *See* FLA.STAT.ANN. § 847.011(9) (Supp.1990).

## THE MILLER V. CALIFORNIA TEST

█ In deciding whether a specific work is or is not obscene, the court must apply the controlling test enunciated in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). To be obscene, there must be proof of all three of the following factors: (1) the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest, (2) measured by contemporary community standards, the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (3) the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. *Id.; also see Memoirs,* 383 U.S. at 419, 86 S.Ct. at 977 (to be obscene, all three elements must be met and each element must be "independently" evaluated); *Penthouse International, Ltd. v. McAuliffe,* 610 F.2d 1353, 1363 (5th Cir.1980) (same); *United States v. Various Articles of Obscene Merchandise,* 709 F.2d 132, 135 (2nd Cir.1983) (same).

## THE RELEVANT COMMUNITY

█ Both the first and second elements of *Miller* require application of "contemporary community standards." The issues of the size of the appropriate community, its composition, and the view of the average person in that group are all questions of fact to be decided by the trier of fact, which is the court in this case. *See Miller,* 413 U.S. at 30, 93 S.Ct. at 2618.

Both parties Apparently assumed that the relevant community was only Broward County, Florida. Neither litigant presented any evidence to support this assumption, which was apparently based upon the jurisdiction of the Broward County Sheriff and the County lines. However, the boundaries of the relevant community under *Miller* are a matter for judicial, not legislative, determination. *See Smith,* 431 U.S. 291, 303, 97 S.Ct. 1756, 1765, 52 L.Ed.2d 324 (1977).

■ This court finds that in assessing whether this work is obscene, the relevant community is the area of Palm Beach, Broward, and Dade Counties. In reaching this determination, the court has considered numerous factors. These three adjoining counties share common geography on the eastern coast of Florida. They also share beachfront on the Atlantic Ocean including all the common experiences that derive therefrom including the exposure to tourists. All three counties are open communities in the sense that visitors, from abroad and other states, come to South Florida to vacation and resettle. The area is also linked via common transportation. The three counties are connected by rail (Florida East Coast, Amtrak, and Tri–Rail), water (Atlantic Ocean and the Intracoastal Waterway), air, and highway (Federal Highway, Florida Turnpike, and Interstate 95). Through these transportation links, the labor forces of Broward and Dade on the one hand, and Broward and Palm Beach on the other, commingle. Each county has targeted media, but the three counties generally share access to the same radio and television stations and newspapers. Culturally, there is also a strong connection. Even though each county has a distinct mix of ethnic peoples, cultural events are advertised to and attended by the residents of all three. Because of the strong transportation ties, the area is also linked economically. Trade and industry in South Florida do not limit their business by county lines. Palm Beach, Broward, and Dade also share a similar composition of rural and urban areas, with the larger cities in the eastern portion of each county. Finally, there are political ties. Florida House and Senate Districts include areas within both Broward and Palm Beach. Other State House and Senate Districts include both Broward and Dade Counties. In terms of the federal districts, Congressional District 14 encompasses areas within Broward and Palm Beach, and District 16 includes both Broward and Dade Counties. The state court systems are also linked. The Fourth Appellate District includes both Broward and Palm Beach. The federal district of the Southern District of Florida includes all three counties. This court's district also includes other counties both north of Palm Beach and south of Dade, but after consideration of all the above factors, it is apparent that these other counties do not share the integral connections that Broward, Dade, and Palm Beach have. For example, the counties of Highlands, Okeechobee, Indian River, St. Lucie, and Martin would appear to be a separate community with only significant ties to Palm Beach, not to Broward or Dade.

If the relevant community is Broward, Dade, and Palm Beach counties, the next step is to determine the composition of the citizens of this area. The court, as the finder of fact, must rely upon its own personal knowledge as the parties failed to present evidence on this point. In a word, this area is remarkable for its diversity. The three counties are a mecca for both the very young and the very old. Because of the beachs and the moderate year-round climate, this area includes young persons establishing homes and older residents retiring to enjoy life under the sun. There are both families and single individuals residing in the communities. Generally, the counties are heterogeneous in terms of religion, class, race, and gender.

THE AVERAGE PERSON STANDARD

The next inquiry is more difficult because this court must determine what are the standards for determining prurient interest and patent offensiveness in Palm Beach, Dade, and Broward Counties. The fact that the state legislature has enacted laws prohibiting obscenity is certainly relevant and entitled to great weight. The state's anti-obscenity stance as a whole, however, is overinclusive because other communities outside the three counties are included in the majority who passed the legislation.

■ In determining the views of the "average person" in this area, the court has *not* focused only on the views of the most tolerant or the most sensitive individuals. *See Smith v. United States*, 431 U.S. at 304–05, 97 S.Ct. at 1765–66 ("the most prudish or the most tolerant" or "the reac-

tions of a sensitive or of a callous minority"). The "average person" does not necessarily represent any one segment of the community. It is a legal concept whereby a single perspective is derived from the aggregation or average of everyone's attitudes in the area including persons with differing degrees of tolerance. *See Pinkus v. United States*, 436 U.S. 293, 298–302, 98 S.Ct. 1808, 1812–14, 56 L.Ed.2d 293 (1978) (community under *Miller* is made up of all adults in the area including the most sensitive). The court has not considered minors in its considerations because there was not sufficient evidence adduced at trial that the music was targeted at such persons or that it actually reached children.

This court finds that the relevant community standard reflects a *more* tolerant view of obscene speech than would other communities within the state. This finding of fact is based upon this court's personal knowledge of the community. The undersigned judge has resided in Broward County since 1958. As a practicing attorney, state prosecutor, state circuit judge, and currently, a federal district judge, the undersigned has traveled and worked in Dade, Broward, and Palm Beach. As a member of the community, he has personal knowledge of this area's demographics, culture, economics, and politics. He has attended public functions and events in all three counties and is aware of the community's concerns as reported in the media and by word of mouth. In almost fourteen years as a state circuit judge, the undersigned gained personal knowledge of the nature of obscenity in the community while viewing dozens, if not hundreds of allegedly obscene films and other publications seized by law enforcement.

The court does not adopt the plaintiffs' position that these three counties can be labeled as "tolerant" per se as opposed to some degree thereof. Neither the trier of fact's personal knowledge nor the plaintiffs' evidence supports such a conclusion. The plaintiffs argue that the lack of written complaints in the *Nasty* investigation file created by the Broward Sheriff's office is evidence of a tolerant community standard. While this fact is entitled to some weight, it is far from significant. There may be many reasons why concerned citizens have not complained. For example, the *Nasty* recording was not released until 1989 and it takes time for even a popular musical release to reach the public consciousness. Although the Sheriff has the duty to enforce the obscenity laws regardless of community protest, Deputy Wichner's explanation of why this particular album was singled out can reasonably be linked to significant community discontent, whether communicated by telephone calls, anonymous messages, or letters to the police. Furthermore, the vast majority of complaints in the file, although not exclusively from Broward County, were residents of the relevant community.

Further, the plaintiffs' reliance upon the admission of other sexually explicit works is also not entitled to great weight in determining community standards. First, the Supreme Court has recognized that this type of evidence does not even have to be considered even if the comparable works have been found to be nonobscene. *See Hamling v. United States*, 418 U.S. 87, 126–27, 94 S.Ct. 2887, 2912–13, 41 L.Ed.2d 590 (1974). In this case, there is no evidence that the comparable materials are not themselves obscene. More importantly, most of the materials are simply irrelevant. This case involves the alleged obscenity of a musical recording. Evidence of depictions of sexual conduct in pictures, moving or still, is not substantially equivalent to musical lyrics.

The most comparable works introduced are the sexually explicit writings in the various books and magazines, the audio tape entitled *Raw* by Eddie Murphy, and the double cassette tape recording by Andrew Dice Clay. All three of these works focus upon a verbal message analogous to the format in the *Nasty* recording. The court does give these particular works some weight.

The plaintiffs also raise several collateral arguments as to why this court is allegedly unable to determine the community standards. They claim that the defen-

dant's failure to introduce evidence at the trial including expert testimony is fatal. The plaintiffs also allege that this court's opinion will only reflect the personal opinion of the undersigned judge, not the relevant community. They support this argument by pointing to the court's alleged refusal to empanel a jury in this case.

Dealing with the last contention first, the plaintiffs' argument on the lack of a jury is disingenuous. First, the plaintiffs filed this action in federal court and only requested equitable relief without any right to a trial by jury. Second, there is no Constitutional right to trial by jury in obscenity cases. *See Alexander v. Virginia,* 413 U.S. 836, 93 S.Ct. 2803, 37 L.Ed.2d 993 (1973). Finally, neither party agreed to trial by jury. If both parties consent, Federal Rule 39(c) allows a court to empanel a jury whose verdict would have the same binding effect as if trial by jury was a matter of right. The provision also allows for use of an advisory jury whose verdict is not binding on the court. The defendant Navarro only consented to an advisory jury. The plaintiffs conditioned their consent to any form of a jury upon the court's ruling on another motion before the court. In that motion, the plaintiffs advanced the argument that this court should impose a standard of proof more demanding than a preponderance of the evidence upon the defendant on the obscenity issue. Such a request was without merit. This is a civil, not a criminal case, and hence does not require proof by clear and convincing evidence or, proof beyond a reasonable doubt. The plaintiffs would agree to an advisory jury only if this court required a standard of clear and convincing evidence. Even if the court had used an advisory jury, the verdict of six other citizens on the issue of community standards would have been of doubtful value. The individuals would have only been Broward County residents. Moreover, this court, as demonstrated, has sufficient personal knowledge of the community and its standards to make a decision in this case.

The plaintiffs' claim that this court cannot decide this case without expert testimony and the introduction of specific evidence on community standards is also without merit. The law does not require expert testimony in an obscenity case. The defendant introduced the *Nasty* recording into evidence. As noted by the Supreme Court in *Paris Adult Theatre I,* when the material in question is not directed to a "bizarre, deviant group" not within the experience of the average person, the best evidence is the material, which "can and does speak for itself." *Paris Adult Theatre I,* 413 U.S. at 56 & n. 6, 93 S.Ct. at 2634 & n. 6.

In deciding this case, the court's decision is not based upon the undersigned judge's personal opinion as to the obscenity of the work, but is an application of the law to the facts based upon the trier of fact's personal knowledge of community standards. In other works, even if the undersigned judge would not find *As Nasty As They Wanna Be* obscene, he would be compelled to do so if the community's standards so required.

■■■ The true basis of the plaintiffs' argument is that the legal standard of the "community" and the "average person" are too nebulous to apply to an issue of constitutional law. This position ignores the fact that the law does not require absolute certainty as to its determinations. The standard of proof is adjusted upward or downward to reflect the balance between the competing rights of individuals and society. In civil cases, the law gives effect to a determination based on a preponderance of the evidence. Even in criminal matters where a person can lose his liberty, property, and even his life, there is no requirement that the government prove guilt beyond all possible doubt. As noted in *Hamling v. United States,* 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974), "[I]t is common experience that different juries may reach different results ... This is one of the consequences we accept under our jury system." The same holds true when the court is the finder of fact in a bench trial. Application of the "community" and "average person" standards are no different than that of applying the standard of the "reasonable person" used in negligence and tort law. *See Pinkus v. United States,* 436 U.S. 293, 300–01, 98

S.Ct. 1808, 1813–14, 56 L.Ed.2d 293 (1978); *Smith*, 431 U.S. at 308, 97 S.Ct. at 1767.

## THE FIRST MILLER TEST: PRURIENT INTEREST

 This court finds, as a matter of fact, that the recording *As Nasty As They Wanna Be* appeals to the prurient interest. The Supreme Court has defined prurient as "material having a tendency to excite lustful thoughts." *Roth*, 354 U.S. at 487 n. 20, 77 S.Ct. at 1310 n. 20. Appeals only to "normal, healthy sexual desires" are not adequate to meet the test. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498, 105 S.Ct. 2794, 2798, 86 L.Ed.2d 394 (1985). The material must exhibit a "shameful or morbid interest in nudity, sex, or excretion". *Id.* (readopting definition in *Roth*, 354 U.S. at 487 n. 20, 77 S.Ct. at 1310 n. 20).

*Nasty* appeals to the prurient interest for several reasons. First, its lyrics and the titles of its songs are replete with references to female and male genitalia, human sexual excretion, oral-anal contact, fellatio, group sex, specific sexual positions, sadomasochism, the turgid state of the male sexual organ, masturbation, cunnilingus, sexual intercourse, and the sounds of moaning. Florida's Legislature has provided a valuable source of evidence in the form of its obscenity statutes for determining what is sexual conduct. The initial provision is section 847.001(11), Florida Statutes, which defines "sexual conduct" to include "actual or simulated sexual intercourse, deviate sexual intercourse, ... masturbation, ... sadomasochistic abuse; [or] actual lewd exhibition of the genitals"." Section 847.001(2), Florida Statutes, defines deviate sexual intercourse as sexual conduct between unmarried persons involving contact between the penis and the anus, the mouth and the penis, or the mouth and the vulva. Section 847.001(8) defines sadomasochistic abuse as satisfaction from sadistic violence derived by inflicting harm upon another. These definitions cover most, if not all, of the sexual acts depicted in *As Nasty As They Wanna Be.*

Furthermore, the frequency and graphic description of the sexual lyrics evinces a clear intention to lure hearers into this activity. The depictions of ultimate sexual acts are so vivid that they are hard to distinguish from seeing the same conduct described in the words of a book, or in pictures in periodicals or films.

It is also noteworthy that the material here is music. It is true that it would be difficult, albeit not impossible, to find that mere sound without lyrics is obscene. Music is sufficiently subjective that reasonable persons could disagree as to its meaning. But, the focus of the *Nasty* recording is its lyrics. Based on the evidence at trial, music of the "rap" genre focuses upon verbal messages accentuated by a strong beat. 2 Live Crew itself testified that the *Nasty* recording was made to be listened and danced to. The evident goal of this particular recording is to reproduce the sexual act through musical lyrics. It is an appeal directed to "dirty" thoughts and the loins, not to the intellect and the mind.

 The court has also given some, but not great, weight to the plaintiffs' commercial motive. Of course, the fact that the plaintiffs made a profit from the public distribution of the *Nasty* recording is not relevant in determining obscenity. *See Ginzburg v. United States*, 383 U.S. 463, 474, 86 S.Ct. 942, 949, 16 L.Ed.2d 31 (1966). However, the court can consider the manner in which the material was distributed and promoted to determine if the "leer of the sensualist" permeates the work. *Id.* at 465–66, 468, 475–76, 86 S.Ct. at 944–45, 946, 949–50. In *Ginzburg*, the court found that publishers of certain magazines and books had directed their advertising in such a way as to commercially exploit erotica solely for the sake of their prurient appeal. *Id.* at 466, 86 S.Ct. at 945. For example, the advertisements sent to potential customers "stressed the sexual candor of the respective publications, and openly boasted that the publishers would take full advantage of what they regarded [as] an unrestricted license allowed by law in the expression of sex and sexual matters." *Id.* at 469, 86 S.Ct. at 946. The Court went on to

note that, "the deliberate representation of petitioners' publications as erotically arousing, for example, stimulated the reader to accept them as prurient; he looks for titillation, not for saving intellectual content." *Id.* at 470, 86 S.Ct. at 947.

Consideration of the creator's intent to appeal to the prurient interest is still a valid consideration today, even after *Miller v. California. See Splawn v. California,* 431 U.S. 595, 97 S.Ct. 1987, 52 L.Ed.2d 606 (1977); *Pinkus,* 436 U.S. 293, 98 S.Ct. 1808, 56 L.Ed.2d 293 (1978).

The record at trial indicates that the plaintiffs' commercial exploitation of this work was done in a manner calculated to make a salacious appeal. The title of the recording, *As Nasty As They Want To Be,* in addition to the names of many of the songs and the illustration on the recordings' insert certainly fit within the confines of the *Ginzburg* case for materials "look[ing] for titilation."

One of the more interesting points suggested by the evidence at trial, but not dwelt on by the defendant, was that 2 Live Crew made two apparently identical albums with the only difference being the sexually explicit lyrics. The plaintiffs' own expert, John Leland, testified that the *Nasty* recording, without the salacious lyrics, would not have been expected to sell more than 500,000 copies nationwide. To date, the *Nasty* version has sold 1.7 million copies. The identical recording sans sexual lyrics (*Clean*) has sold only 250,000 copies. The difference between the actual sales of the two recordings can reasonably be found to have been motivated by the "leer of the sensualist". The plaintiffs cannot claim they needed the vulgar lyrics to promote their message since the plaintiffs' own experts testified that music from neither the "rap" or "hip-hop" genre does not require the use of such language.

Finally, the plaintiffs rely upon testimony, both lay and expert, that the *Nasty* recording did not actually physically excite anyone who heard it and indeed, caused boredom after repeated play. However, based on the graphic deluge of sexual lyrics about nudity and sexual conduct, this court has no difficulty in finding that *As Nasty As They Wanna Be* appeals to a shameful and morbid interest in sex.

## THE SECOND MILLER TEST: PATENTLY OFFENSIVE

The court also finds that the second element of the *Miller* test is satisfied in that the *Nasty* recording is patently offensive. This is a question of fact, which must be measured by contemporary community standards. *See Miller,* 413 U.S. at 30, 93 S.Ct. at 2618.

■ It is quite true that not all speech with sex as its topic is obscene. *See Roth,* 354 U.S. at 487, 77 S.Ct. at 1310. The *As Nasty As They Wanna Be* recording is another matter.

The recording depicts sexual conduct in graphic detail. The specificity of the descriptions makes the audio message analogous to a camera with a zoom lens, focusing on the sights and sounds of various ultimate sex acts. Furthermore, the frequency of the sexual lyrics must also be considered. With the exception of part B on Side 1, the entire *Nasty* recording is replete with explicit sexual lyrics. This is not a case of subtle references or innuendo, nor is it just "one particular scurrilous epithet" as in *Cohen v. California,* 403 U.S. 15, 22, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971).

■ As already noted, Florida's Legislature has defined obscene acts to include sadomasochistic sexual conduct, oral sex, and anal intercourse. *See* FLA.STAT. ANN. §§ 847.001(2), .001(8) (Supp.1990). In addition, Florida's obscenity statutes are intended to have the broadest, constitutional scope. *See* FLA.STAT.ANN. § 847.001(7) (Supp.1990). States may outlaw certain portrayals of sexual conduct and nudity if they constitute "hardcore pornography." *See Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974). In *Jenkins,* the Supreme Court reversed a conviction for distribution of the film "Carnal Knowledge" which contained scenes of a woman with a bare midriff and several lovemaking sessions. *Id.* at 161, 94

S.Ct. at 2755. This depiction was held by the Court to not be within the hardcore category. As noted by the Court,

> While the subject matter of the picture is, in a broader sense, sex, and there are scenes in which sexual conduct including "ultimate sexual acts" is to be understood to be taking place, the camera does not focus on the bodies of the actors at such times. There is no exhibition whatever of the actors' genitals, lewd or otherwise, during these scenes. There are occasional scenes of nudity, but nudity alone is not enough to make material legally obscene under the *Miller* standards. *Id.* at 161, 94 S.Ct. at 2755.

In *Miller*, the Supreme Court gave two examples of the type of conduct subject to state regulation: "(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated. (b) Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Id.*, 413 U.S. at 25, 93 S.Ct. at 2615. The conduct described in the *Nasty* recording is certainly within the scope of the Florida statutes. The state law, of course, is not dispositive on the question of whether this particular community would be patently offended, but it is entitled to significant weight. *Smith*, 431 U.S. at 307–08, 97 S.Ct. at 1767–68.

█ While the above facts are sufficient to support a finding that this material is patently offensive, there are additional considerations that support such a finding. First, the *Nasty* lyrics contain what are commonly known as "dirty words" and depictions of female abuse and violence. It is likely that these offensive descriptions would not of themselves be sufficient to find the recording obscene. *See, e.g., American Booksellers Association, Inc. v. Hudnut*, 771 F.2d 323 (7th Cir.1985) (sexual subordination of women); *New Jersey v. Rosenfeld*, 62 N.J. 594; 303 A.2d 889 (Sup. Ct.1973) (after remand for reconsideration by U.S. Supreme Court in light of *Cohen v. California*, state court acknowledged that the use of public profanity, if not rising to the level of fighting words, was constitutionally protected). When these terms are used with explicit sexual descriptions, however, they may be considered on the issue of patent offensiveness. Secondly, the material here is music which can certainly be more intrusive to the unwilling listener than other forms of communication. Unlike a video tape, a book, or a periodical, music must be played to be experienced. A person can sit in public and look at an obscene magazine without unduly intruding upon another's privacy; but, even according to the plaintiffs' testimony, music is made to be played and listened to. A person laying on a public beach, sitting in a public park, walking down the street, or sitting in his automobile waiting for the light to change is, in a sense, a captive audience. While the law does require citizens to avert their ears when speech is merely offensive, they do not have an obligation to buy and use ear plugs in public if the state legislature has chosen to protect them from obscenity.

Finally, in determining whether the *Nasty* recording is patently offensive, it is again proper to consider the plaintiffs' commercial exploitation of sex to promote sales. As noted by the Supreme Court in *Ginzburg v. United States*, 383 U.S. 463, 470, 86 S.Ct. 942, 947, 16 L.Ed.2d 31 (1966), representations of a publication as erotically arousing "would tend to force public confrontation with the potentially offensive aspects of the work; the brazenness of such an appeal heightens the offensiveness of the publications to those who are offended by such material." Such is the case here, as already discussed. Again, while this factor has not been given great weight, it is entitled to consideration.

### THE THIRD MILLER TEST: SOCIAL VALUE

█ The final factor under *Miller* is whether the *Nasty* recording, taken as a whole, lacks serious literary, artistic, political, or scientific value. This factor is not measured by community standards. The proper inquiry is whether a reasonable person would find serious social value in the material at issue. *See Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 1921, 95 L.Ed.2d

439 (1987). The plaintiffs correctly note that the value of a work can pass muster under *Miller* if it has serious merit, measured objectively, even if a majority of the community would not agree.

As a preliminary matter, it is again important to note what this case is *not* about. Neither the "Rap" or "Hip–Hop" musical genres are on trial. The narrow issue before this court is whether the recording entitled *As Nasty As They Wanna Be* is legally obscene.

■ This is also not a case about whether the group 2 Live Crew or any of its other music is obscene. The third element of the *Miller* test focuses upon the social value of the particular work, not its creators. The fact that individuals of whom we approve hold objectionable ideas or that people of whom we do not approve hold worthy ideas does not affect judicial review of the value of the ideas themselves.

The Phillistines are not always wrong, nor are the guardians of the First Amendment always right.

This court must examine the *Nasty* recording for its content; the inquiry is objective, not *ad hominem*.

■ Finally, this court's role is not to serve as a censor or an art and music critic. If the *Nasty* recording has serious literary, artistic, political, or scientific value, it is irrelevant that the work is not stylish, tasteful, or even popular.

The plaintiffs themselves testified that neither their music nor their lyrics were created to convey a political message.

■ The only witness testifying at trial that there was political content in the *Nasty* recording was Carlton Long, who was qualified as an expert on the culture of black Americans. This witness first stated that the recording was political because the 2 Live Crew, as a group of black Americans, used this medium to express themselves. While it is doubtless true that *Nasty* is a product of the group's background, including their heritage as black Americans, this fact does not convert whatever they say, or sing, into political speech.

Professor Long also testified that the following passages from the recording contained political content: a four sentence phrase in the song "Dirty Nursery Rhymes" about Abraham Lincoln, the word "man" in the Georgie Porgie portion of the same song, and the use of the device of "boasting" to stress one's manhood. Even giving these isolated lyrics the meaning attributed by the expert, they are not sufficient in number or significance to give the *Nasty* recording, as a whole, any serious political value.

In terms of science, Professor Long also suggested that there is cultural content in 2 Live Crew's recording which rises to the level of serious sociological value. According to this witness, white Americans "hear" the *Nasty* recording in a different way than black Americans because of their different frames of references. Long identifies three cultural devices evident in the work here: "call and response", "doing the dozens", and "boasting". The court finds none of these arguments persuasive.

The only examples of "call and response" in the *Nasty* recording are portions where males and females yell, in repetitive verse, "Tastes Great—Less Filling" and, in another song, assail campus Greek–letter group. The phrases alone have no significant artistic merit nor are they examples of black American culture. In the case of "Tastes Great—Less Filling", this is merely a phrase lifted from a beer commercial.

The device of "doing the dozens" is a word game composed of a series of insults escalating in their satirical content. The "boasting" device is a way for persons to overstate their virtues such as sexual prowess.

While this court does not doubt that both "boasting" and "doing the dozens" are found in the culture of black Americans, these devices are also found in other cultures. "Doing the dozens" is commonly seen in adolescents, especially boys, of all races. "Boasting" seems to be part of the universal human condition.

Professor Long also cited to several different examples of literary devices such as

rhyme and allusion which appear in *Nasty*, and points to the song title "Dick Almighty" as an example of the literary device of personification. This, of course, is nonsense regardless of the expert's credentials. "A quotation from Voltaire in the fly leaf of a book", noted the Supreme Court in *Miller*, "will not constitutionally redeem an otherwise obscene publication." 413 U.S. at 25 n. 7, 93 S.Ct. at 2615 n. 7 (quoting *Kois v. Wisconsin*, 408 U.S. 229, 231, 92 S.Ct. 2245, 2246, 33 L.Ed.2d 312 (1972)).

 Prior to *Miller*, the government had to demonstrate that a work was utterly without redeeming social value to be judged obscene. *See Memoirs*, 383 U.S. at 419, 86 S.Ct. at 977. The present test is less stringent, only requiring proof of an absence of serious social worth. This leads to the plaintiffs' strongest argument: that the *Nasty* recording has serious artistic value. This category of social worth is broad enough to include the value contributed by the political, literary, and cultural aspects of the particular work.

The plaintiffs stress that the *Nasty* recording has value as comedy and satire. Certainly, people can and do laugh at obscenity. The plaintiffs point to the audience reaction at trial when the subject recording was played in open court. The audience giggled initially, but the court observed that after the initial titillation, it fell silent.

In a society where obscenity is forbidden, it is human nature to want taste forbidden fruit. It is quite another thing to say that this aspect of humanity forms the basis for finding that *Nasty* has serious artistic value. Furthermore, laughter can express much more than enjoyment and entertainment. It is also a means of hiding embarrassment, concealing shame, and releasing tension. The fact that laughter was only heard at the time that the first song of the tape was played is probative on what the audience's outbursts really meant. It cannot be reasonably argued that the violence, perversion, abuse of women, graphic depictions of all forms of sexual conduct, and miscroscopic descriptions of human genitilia contained on this recording are comedic art.

The *Nasty* recording is not comedy, but is first and foremost, music. Initially, it would appear very difficult to find a musical work obscene. As noted by the American Civil Liberties Union, the meaning of music is subjective and subject only to the limits of the listener's imagination. *See* ACLU Brief at 3.

 Music nevertheless is not exempt from a state's obscenity statutes. Musical works are obscene if they meet the *Miller* test. Certainly it would be possible to compose an obscene oratoro or opera and it has probably been done.

The plaintiffs claim that this case is novel since it seeks to determine whether music can be obscene. The particular work here, although belonging to the general category of music, however, is to be distinguished from a purely insturmental work, or other more common recordings with a fairly equal emphasis on music and lyrics. The focus of the *Nasty* recording is predominately on the lyrics. Expert testimony at trial indicates that a central characteristic of "rap" music is its emphasis on the *verbal* message. Rhythm is stressed over melody, not for its own sake, but to accentuate the words of the song. The pounding beat and the presence of near continuous lyrics support this conclusion. 2 Live Crew's music is explicitly clear as to its message. Although music and lyrics must be considered jointly, it does not significantly alter the message of the *Nasty* recording to reduce it to a written transcription. The Supreme Court's decision in *Kaplan v. California*, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973), is applicable here. The Court held that an expression by words alone, albeit in a written form, can be legally obscene even if there are no accompanying pictorial depictions. *Id.* at 118–119, 93 S.Ct. at 2683–2684. The case at bar is an extension of the law to the extent that words, as lyrics in music, can be obscene.

The key to judging the *Nasty* recording is to consider it as a whole. 2 Live Crew has "borrowed" components called "riffs"

from other artists. Taking the work in its entirety, the several riffs do not lift *Nasty* to the level of a serious artistic work. Once the riffs are removed, all that remains is the rhythm and the explicit sexual lyrics which are utterly without any redeeming social value.

Obscenity is not a required element for socially valuable "rap" or "hip-hop" music. 2 Live Crew itself proved this point by the creation of its *Clean* recording.

The court is reminded of a story by Charles Baudelaire, a poet who also had problems with the civil authorities of his day. In *My Heart Laid Bare* (Vanguard Press 1951), at pages 203–04, he writes:

> All the imbeciles of the Bourgeoisie who intentionally use the words, "immoral", "immorality", "morality in art" and other such stupid expressions remind me of Louise Villdieu, a five-franc whore who once went with me to the Louvre. She has never been there before, and began to blush and cover her face with her hands, repeatedly plucking at my sleeve and asking me, as we stood before deathless statutes and pictures, how such indecencies could be flaunted in public.

One of the plaintiffs' expert witnesses testified at trial that material is art if it causes a reaction in the audience perceiving it. If that reaction is an appeal to the prurient interest in a patently offensive way, and if the material lacks serious lieterary, artistic, political or scientific, the law does not call that art—it calls it obscenity and when so proven beyond a reasonable doubt is a crime in Florida.

## OBSCENITY? YES!

The recording *As Nasty As They Wanna Be*, taken as a whole, is legally obscene.

The court so finds by a preponderance of the evidence although the standard of proof presents no real issue.

The court also finds *As Nasty As They Wanna Be* to be legally obscene under the *Miller* test by clear and convincing evidence, which standard the plaintiffs maintain is the correct burden of proof.

## PRIOR RESTRAINT AND PROCEDURAL DUE PROCESS

A prior restraint can be generally defined as any condition imposed by the government on the publication of speech. *See, e.g., Times Film Corp. v. City of Chicago*, 365 U.S. 43,55 n. 2, 81 S.Ct. 391, 398 n. 2, 5 L.Ed.2d 403 (1961) (Warren, C.J., dissenting). Such a limitation can come in varying forms including permit requirements, licensing taxes, registration, prepublication submission of materials, seizures, and judicial injunctions. The distinguishing characteristic of a prior restraint is that the condition vests power in a nonjudicial official to make the final decision as to whether speech will be permitted at all or in what form. *See, e.g., Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556–57, 95 S.Ct. 1239, 1245–46, 43 L.Ed.2d 448 (1975); *Freedman v. Maryland*, 380 U.S. 51, 58, 85 S.Ct. 734, 738, 13 L.Ed.2d 649 (1965).

Prior restraints are repugnant to the right of free speech. The First Amendment prohibits this type of regulation to minimize the risk of governmental censorship. Many forms of speech are of value because of the urgency and immediacy of the idea expressed. Even if a censor ultimately allows publication, significant delay in the decisionmaking process can destroy the fleeting value of the speech. *See, e.g., Southeastern Promotions*, 420 U.S. at 562, 95 S.Ct. at 1248 (use of a theater). If speech is delayed or denied, the rights of both the speaker and his audience are impaired and society is the ultimate "loser." *See Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965); *also see Marcus v. Search Warrants of Property*, 367 U.S. 717, 736, 81 S.Ct. 1708, 1718, 6 L.Ed.2d 1127 (1961); *Quantity of Copies of Books v. Kansas*, 378 U.S. 205, 214, 84 S.Ct. 1723, 1728, 12 L.Ed.2d 809 (1964). Furthermore, if allowed, prior restraints necessarily legitimatize the existence of a censor. The danger is that officials, even if originally well-intentioned, may be driven to suppress an ever growing amount of speech.

■ For all of these reasons, the First Amendment casts a jaundiced eye on any form of prior restraint. But, as with the right of free speech itself, this prohibition is not absolute. A limitation on speech prior to its publication may withstand constitutional scrutiny in "exceptional cases." *Near v. Minnesota,* 283 U.S. 697, 715–16, 51 S.Ct. 625, 630–31, 75 L.Ed. 1357 (1931); *also see Southeastern Promotions,* 420 U.S. at 559, 95 S.Ct. at 1246. Included within this category are all types of speech unprotected by the Constitution such as obscenity. *Near,* 283 U.S. at 716, 51 S.Ct. at 631.

The fact that the government may prevent obscene materials from ever reaching their intended audience assumes that the issue of obscenity has already been decided. It is the courts and not nonjudicial officials who must decide whether a specific work is obscene. *See United States v. Thirty–Seven Photographs,* 402 U.S. 363, 370–71, 91 S.Ct. 1400, 1405–06, 28 L.Ed.2d 822 (1971). Interpreting obscenity laws requires "appraisal of facts, the exercise of judgment, and the formation of an opinion"; in other words, the exercise of judicial power. *See Southeastern Promotions,* 420 U.S. at 554–55, 95 S.Ct. at 1244–45 (citation omitted); *Staub v. Baxley,* 355 U.S. 313, 323, 78 S.Ct. 277, 282, 2 L.Ed.2d 302 (1958) (same); *also see Thirty–Seven Photographs,* 402 U.S. at 370–71, 91 S.Ct. at 1405–06 ("determinations of obscenity should be left to courts and juries."). Because the line between free speech and obscenity is so subtle, the law imposes a presumption that all utterances are constitutionally protected until there is a judicial decision to the contrary. *See, e.g., Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 109 S.Ct. 916, 927, 103 L.Ed.2d 34 (1989); *Heller v. New York,* 413 U.S. 483, 491, 93 S.Ct. 2789, 2794, 37 L.Ed.2d 745 (1973).

■ Because of this presumption, the state must follow constitutionally mandated procedures in seizing obscene works. The state may criminalize obscenity, but its regulation must comport with the minimum procedural safeguards required by due process. To trigger the Fourteenth Amendment's application, the state regulation must constitute a deprivation of a protected interest. Florida law provides that no property interest exists in obscene materials. *See* FLA.STAT.ANN. § 847.011(7) (Supp.1990). In essence, this state has made obscenity a form of contraband, the seizure of which would not normally implicate the Fourteenth Amendment. However, because free speech has an independent source of protection under the First Amendment as a constitutional "liberty", arguably obscene articles are not treated by the law like other contraband such as illegal drugs. *See Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 326 n. 5, 99 S.Ct. 2319, 2324 n. 5, 60 L.Ed.2d 920 (1979); *Roaden v. Kentucky,* 413 U.S. 496, 501–03, 93 S.Ct. 2796, 2799–2801, 37 L.Ed.2d 757 (1973); *Quantity of Books,* 378 U.S. at 211–12, 84 S.Ct. at 1726–27; *Marcus v. Search Warrants of Property,* 367 U.S. 717, 730–31, 81 S.Ct. 1708, 1715–16, 6 L.Ed.2d 1127 (1961); *Penthouse International, Ltd. v. McAuliffe,* 610 F.2d 1353, 1359 (5th Cir.1980) ("There must be some judicial determination of obscenity before a seizure or "constructive seizure" may occur.") (citation omitted). Although it has been assumed to this point, music is clearly a form of expression within the scope of the free speech guaranty and thereby entitled to the presumption of constitutionality as a form of "liberty" protected under the Fourteenth Amendment. *Cf. Southeastern Promotions,* 420 U.S. at 557–58, 95 S.Ct. at 1245–46 (theater is form of speech); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501–02, 72 S.Ct. 777, 780–81, 96 L.Ed. 1098 (1952) (motion picture film is form of speech).

## NASTY SUPPRESSION

The remaining issues are whether the defendant's actions in this case constituted a Fourteenth Amendment deprivation and prior restraint and, if so, whether the accompanying procedures were adequate to comport with due process and the First Amendment.

■ Deputy Wichner's initial purchase of *Nasty* at Sound Warehouse was neither a prior restraint nor a constitutional deprivation. *See Maryland v. Macon*, 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985). Moreover, his impulse to seek judicial guidance was equally proper. Prior to any seizure of arguably obscene materials, there must be a minimum of an *ex parte* hearing before a judicial officer to determine if probable cause exists. *See Marcus*, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); *Roaden*, 413 U.S. at 504 n. 5, 93 S.Ct. at 2801 n. 5.

Judge Grossman's review of the probably cause application was also the type of "searching inquiry" demanded by the Constitution prior to a seizure. *See Marcus*, 367 U.S. at 732, 81 S.Ct. at 1716. He reviewed the *Nasty* recording "in its entirety" and had the transcript of six of the songs to review. His decision took several days and he requested additional information from the deputy about the location and accessability of the purchased tape. This is not a case where the probable cause finding was based solely upon a policeman's subjective conclusion that *Nasty* was obscene. *See Lee Art Theatre, Inc. v. Virginia*, 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968).

■ It is at this point that the facts of this case become unusual or, in the prior words of this court, "bizarre." The state court judge issued an order finding probable cause that *Nasty* was obscene. Why this order was entered is unclear. There is no statutory or common law basis for such a procedure. There was no case or controversy before that court as the only party was Deputy Wichner. Nor did Wichner seek an injunctive remedy, or a warrant to search for or to seize suspected obscene materials. What he apparently sought was a legal opinion, and in this he was successful. This is unusual since the giving of legal advice is normally the function of lawyers—not judges.

Nonetheless, the order of probable cause issued. The Broward County Sheriff's office then copied and distributed Judge Grossman's order to the retail music stores in the county which were selling *Nasty*. The result was predictable. The store managers, as law abiding citizens pulled the recording from their shelves. Individuals confronted with the threat of arrest by law enforcement officers and presented with a court's order can be expected to do as they are told. Courts declare the law through their orders and all citizens are conscious of our duty to obey the law.

Despite his arguments to the contrary, the Sheriff's actions in this case constituted a seizure of presumptively protected speech within the scope of the First and Fourteenth Amendments.

The First Amendment rights of 2 Live Crew and the music store owners to publish the recording and the public's rights as an audience were all infringed. Even though the defendant is correct that there was no physical transfer of possession of the *Nasty* inventories, the notion of a seizure for prior restraint purposes encompasses the conduct here. Whether the seizure is called "constructive" or "actual", there was a direct relationship between the sheriffs' visits and the surrounding publicity on the one hand, and the store operators' decision to remove *Nasty* from their shelves on the other.

The "common thread" of the law is that when an arguably protected work clothed in the presumption of constitutional free speech is removed from public distribution, the state has imposed a prior restraint. *See Roaden*, 413 U.S. at 504–05, 93 S.Ct. at 2801–02 (1973); *Cf. Mishkin v. New York*, 383 U.S. 502, 513, 86 S.Ct. 958, 965, 16 L.Ed.2d 56 (1966) (Court refused to reach issue of seizure's legality because record inadequate on the quantity of books seized and whether they were "on the threshold of dissemination.").

The final decision of whether *As Nasty As They Wanna Be* would be published was left in the nonjudicial hands of the Broward County Sheriff's office. *See Southeastern Promotions*, 420 U.S. at 556–57, 95 S.Ct. at 1245–46 ("denying use of the municipal facility ... constituted the prior restraint. That restraint was final. It was no mere temporary bar while neces-

sary judicial proceedings were under way."). Although the music store operators were the immediate parties who stopped distributing the recording, they so acted only after the police visits and the delivery of the court's probable cause order. Had the deputies only given advice to aid compliance with the law (without also threatening arrest while presenting a judicial order of probable cause) and had the store operators decided to accept the advice and remove the recording from their inventory, this would be a different case. As noted in *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 109 S.Ct. 916, 103 L.Ed.2d 34 (1963), "The mere assertion of some possible self-censorship ... is not enough to render an anti-obscenity law unconstitutional." *Id.* 109 S.Ct. at 926. Indeed, law enforcement officers also have a right of free speech, which citizens are at liberty to disagree with if they believe the police have misstated the law. Justice John Harlan stated in *Bantam Books, Inc. v. Sullivan*, that " 'Bearing the discomfiture and cost' even of 'a prosecution for crime [though] by an innocent person is one of the painful obligations of citizenship.' " 372 U.S. at 82, 83 S.Ct. at 645 (dissenting opinion) (citation omitted).

The argument that no other musical works were banned and that the sheriffs' visits did not otherwise disrupt business in the stores is of no consequence. The material issue in this case is that there was a county wide seizure of *As Nasty As They Wanna Be.* Every single copy of this recording was removed from the shelves of approximately forty stores. Because of the vulnerability of First Amendment rights, the seizure of even a single copy of one work is constitutionally significant. *See Heller v. New York*, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973) (if seizure of a single work prior to trial will deprive the public of the sole copy, the police must make and return a copy for pretrial publication or return the original).

The facts here are also materially similar to the situations presented by the cases of *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), *Penthouse International, Ltd. v. McAuliffe*,

610 F.2d 1353 (5th Cir.1980), and *Council for Periodical Distributors Association v. Evans*, 642 F.Supp. 552 (M.D.Ala.1986), *aff'd*, 827 F.2d 1483 (11th Cir.1987). In each case the courts found that the conduct of the governmental officials constituted an unconstitutional prior restraint.

In *Bantam Books*, an administrative commission created under state law was given authority to review books and magazines. The commission circulated blacklists of publications believed by them to be objectionable for sale to minors. The lists were sent on official stationery with a reminder that the commission had a legal duty to recommend prosecutions for obscentity law violations to the state Attorney General. Upon receiving the notices, publishers stopped selling the listed items. Police officers conducted follow-up visits to oversee compliance. 372 U.S. at 61–63, 83 S.Ct. at 634–635. The Supreme Court finding this process to be a prior restraint, said:

> People do not lightly disregard public officers' thinly veiled *threats* to institute criminal proceedings against them if they do not come around ... The Commission's notices, phrased virtually as *orders*, reasonably understood to be such by the distributor, invariably followed up by *police visitations*, in fact stopped the circulation of the listed publications ... It would be naive to credit the State's assertion that these blacklists are in the nature of mere legal advice, when they plainly serve as instruments of regulation independent of the laws against obscenity. *Id.* at 68–69, 83 S.Ct. at 638–639 (emphasis added) (footnote omitted).

The same result was reached in this Circuit. In the *Penthouse* case, Georgia's Solicitor General used a scheme of media announcements, visits to retailers, and warrantless arrests to ban the sale of sexual publications without instituting judicial proceedings for a final determination of the issue of obscenity. 610 F.2d at 1355–58. In *Evans*, a county district attorney pursued a two-tiered approach. To persuade a distributor to stop selling objectionable works, the attorney warned that further sales would result in the institution of crim-

inal and nuisance proceedings. The distributor withdrew his prior opposition to the district attorney's demands and signed a consent decree banning all future sales of the listed items. On the retail level, the district attorney informed all store owners that they should attend a meeting at the county courthouse. He "strongly suggested" that all sales of specified publications should stop or he would begin arrests. 642 F.Supp. at 554–57.

■ The defendant attempts to distinguish *Bantam Books*, *Penthouse*, and *Evans* by arguing that in those three cases there was a lack of judicial involvement unlike the probable cause order here. Further, Navarro argues that those visits were made for the stated purpose of intimidating distributors to stop selling objectionable works whereas the efforts of his deputies were all in good faith. The first alleged distinction is unpersuasive because, as already discussed, the order of probable cause was of no legal effect. Further, by publicizing the order, the sheriffs' office gave an apparent, albeit misleading, judicial endorsement to their threats of arrest. Further, as also noted previously, the good faith of the deputies is not controlling if the effect of their actions was to impose a prior restraint on presumptively protected speech.

## THE LACK OF SENSITIVE TOOLS

■ Because obscenity is an appropriate subject for state regulation, there is no absolute right to be free from all prior restraints. *Near*, 283 U.S at 716, 51 S.Ct. at 631. To determine whether the *Nasty* ban was an impermissible prior restraint or merely a valid regulation of unprotected obscenity depends on the facts of the case. *See Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441–42, 77 S.Ct. 1325, 1327–28, 1 L.Ed.2d 1469 (1957).

The standard is whether the procedures required by the state are sufficient to guarantee a speedy and correct determination of a work's obscenity; and whether the safeguards are sufficient to reasonably minimize the risk that nonobscene speech will be suppressed. The Supreme Court

observed the need for procedural safeguards in *Marcus v. Search Warrants of Property*, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961): " '[t]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn.... The separation of legitimate from illegitimate speech calls for ... sensitive tools.' " *Id.* at 731, 81 S.Ct. at 1715 (citation omitted). As further noted by the Court in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963):

> [T]he Fourteenth Amendment requires that regulation by the States of obscenity conform to procedures that will ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line. It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments. Our insistence that regulations of obscenity scrupulouly embody the most rigorous procedural safeguards ... is therefore but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks. *Id.* at 66, 83 S.Ct. at 637.

■ The only procedural protections accompanying the ban of *As Nasty As They Wanna Be* were an *ex parte* application to a state judge for an order of probable cause and the fact of the order itself finding that there was probable cause to believe *Nasty* was obscene.

These two procedures were clearly insufficient to meet the minimum requirements of due process. The result was that *Nasty* was subjected to an unconstitional prior restraint and the plaintiffs' rights to publish presumptively protected speech were left twisting in the chilling wind of censorship.

■ The Supreme Court's decision in *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), reaffirmed the minimum procedural safeguards neces-

sary for a prior restraint to pass due process scrutiny. *Also see Southeastern Promotions*, 420 U.S. at 559–60, 95 S.Ct. at 1246–47; *Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 317, 100 S.Ct. 1156, 1162, 63 L.Ed.2d 413 (1980) (*Freedman* applies to judicial orders which impose prior restraint). There are three basic requirements:

> *First*, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. *Second*, any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. *Third*, a prompt final judicial determination must be assured. *Southeastern Promotions*, 420 U.S. at 560, 95 S.Ct. at 1247 (emphasis in original).

By pretrial motion, the defendant accepted the burden of proving that *Nasty* was unprotected speech because it is obscene. As to all the other *Freedman* safeguards, however, the defendant's conduct fell woefully short of legal and constitutional requirements.

First, the Sheriff did not institute judicial proceedings after threatening the music store operators and distributing Judge Grossman's order. The visits occured on or about March 9, 1990. It was not until March 27, 1990, eighteen days later that the defendant finally filed an action in state court.

The defendant noted at the preliminary injunction hearing (April 19, 1990) and at trial (May 14 and 15, 1990) that he was preparing guidelines for the future application of this enforcement technique which would assure that judicial proceedings are promptly initiated. Even after trial, however, there is still no evidence that such rules have been developed and implemented. This is simply intolerable; nor would such future guidelines have any relevance to the Sheriff's conduct in this case.

The defendant's action in this case suffers from the same constitutional infirmity as seen in *Blount v. Rizzi*, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971): total discretion in a nonjudicial officer to initiate judicial proceedings *after* a final decision suppressing arguably obscene materials. In *Blount*, the Postmaster General could intercept suspected obscene mail and hold it for an indefinite time period without any mandatory requirement that he invoke judicial review. Here, the first application for judicial review occured when the plaintiffs—not the Sheriff—filed this lawsuit.

It is well-established that prior restraints vesting unbridled discretion in nonjudicial officials, thereby making their suppression decision final, in effect, are constitutionally unacceptable. *See, e.g., Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 153–54, 89 S.Ct. 935, 938–39, 940, 22 L.Ed.2d 162 (1969); *Staub v. City of Baxley*, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); *Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951).

Why the defendant chose to pursue this type of prior restraint is not clear. Had the Sheriff's office initiated a criminal prosecution, the *Freedman* problems might not have arisen because of the rigorous procedures inherent in criminal proceeding. *See Times Film Corp. v. City of Chicago*, 365 U.S. 43, 82–84, 81 S.Ct. 391, 412–413, 5 L.Ed.2d 403 (1961) (Douglas, J., dissenting). Further, Florida's Legislature has provided a civil remedy in the form of an injunction. *See* FLA.STAT.ANN. § 847.011(8) (Supp. 1990). Because this statute tracks the procedures found constitutionally sufficient in *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957), there would have been no constitutional objection. It is not the duty of this court to dictate to state officials which means are most appropriate to regulate obscenity. *See Freedman*, 380 U.S. at 60, 85 S.Ct. at 739; *Kingsley*, 354 U.S. at 441, 77 S.Ct. at 1327. But, this court must intervene when that choice impermissibly infringes upon the First Amendment.

Second, the prior restraint imposed on *Nasty* was not limited "for only a specified brief period" or restricted to "the purpose of preserving the status quo." Rather, the ban initiated by the visits and the presentation of the probable cause order when com-

bined with the threat of future prosecution was designed to indefinitely suppress the recording. Indeed, Deputy Wichner testified that the Sheriff's office had no plans for future action because there were no further citizen complaints or evidence of sales in the county.

This case is distinguishable from *Heller v. New York*, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973). There, the issue was whether a judge who views a film and finds it obscene can then issue a constitutionally valid warrant for the film's seizure as evidence for trial. The Court held that the seizure of one copy for the bona fide purpose of preserving it as evidence was constitutionally permissible. However, the Court also noted that its holding was limited to cases where there was more than one copy of the film. If there was only a single copy, the government must preserve the status quo by allowing a copy to be made or the original must be returned to allow pretrial publication. *Id.*, 413 U.S. at 492–93, 93 S.Ct. at 2794–95. The status quo for presumptively protected speech is that it remains available to the public. Where the government seizes more than a single copy for evidentiary purposes, however, the constitutional risks are much greater. As noted in *Heller*, "seizing films to destroy them or to *block their distribution* or exhibition is a very different matter from seizing a single copy of a film for the bona fide purpose of preserving it for evidence in a criminal proceeding." *Id.* at 492, 93 S.Ct. at 2794 (emphasis added). The same judicial condemnation of facts materially similar to this case was made in *Penthouse International, Ltd. v. McAuliffe*, 610 F.2d 1353 (5th Cir.1980):

> [T]he procedure adopted and enforced by McAuliffe was much more dramatic and devasting than the mere seizure of one film to be used as evidence. Instead, it resulted in the "constructive seizure" of every magazine in Fulton County, Georgia, that McAuliffe deemed to be obscene. *Id.* at 1362.

Indeed, the facts of this case demonstrate just how dramatically informal censorship can impair the First Amendment. With relative ease, every copy of *Nasty* in Broward County was suppressed within days of the deputies' action. The music store operators understandably chose to obey the law as stated in the probable cause order thereby avoiding possible arrest. They also had a strong economic incentive to remove this single recording from their shelves rather than risk the expense of possible litigation. *See Freedman*, 380 U.S. at 59–60, 85 S.Ct. at 739–40; *Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 493, 82 S.Ct. 1432, 1440, 8 L.Ed.2d 639 (1962).

The defendant claims that the initiation of formal proceedings would have been overaggressive. But, as the Supreme Court has taught, the harm from informal censorship raises grave concerns:

> The Commission's operation is a form of effective state regulation superimposed upon the State's criminal regulation of obscenity and making such regulation largely unnecessary. In thus obviating the need to employ criminal sanctions, the State has at the same time eliminated the safeguards of the criminal process. Criminal sanctions may be applied only after a determination of obscenity has been made in a criminal trial hedged about with the procedural safeguards of the criminal process. The Commission's practice is in striking contrast, in that it provides no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter. It is a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law. *Bantam Books*, 372 U.S. at 69–70, 83 S.Ct. at 638–39.

The final *Freedman* violation is the defendant's lack of assurance of a prompt final judicial determination. The defendant relies upon the existence of the *in rem* action filed in the state circuit court on March 27, 1990. There is no evidence that any decision has been reached in that case or that a trial date has even been set as of the date of this order. Further, the defendant's decision to initiate judicial proceedings and the timing thereof are completely

discretionary with no reasonable guarantee that a prompt decision will be made.

The defendant relies upon the filing date of the state suit to satisfy the dictates of *Freedman v. Maryland*. Because this action was commenced eighteen days after the *Nasty* seizures, reasons Navarro, this civil suit provided the necessary procedural safeguards. Because this position is not legally valid, this court need not reach the issue of whether this eighteen day period would comply with procedural due process.

■ The *Freedman* decision requires that there be a prompt and final judicial decision. This includes not only the time from seizure to filing, but also considers the delay between commencement of the lawsuit and a full adversary hearing; and the time after the trial until the court enters a final order on the issue of obscenity. Unreasonable delay or the lack of assurance at any step is fatal to the constitutional adequacy of the state regulation. *See, e.g., Teitel Films Corp. v. Cusack*, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968) (procedure deficient where no time limit in which judge must issue final order after trial). In this case, there were no assurances at any stage in the proceedings.

■ Moreover, due process requires more than an assurance of a prompt judicial decision. When the government intends to seize large quantities of presumptively protected materials, the First and Fourteenth Amendments require an adversary hearing *before* any seizures are made. *See Fort Wayne Books*, 109 S.Ct. at 929; *Quantity of Books*, 378 U.S. at 210–11, 84 S.Ct. at 1725–26; *Marcus*, 367 U.S. at 735–36, 81 S.Ct. at 1718; *Evans*, 642 F.Supp. 552 (M.D.Ala.1986), *aff'd*, 827 F.2d 1483 (11th Cir.1987). The Supreme Court has clearly held that in the case of massive seizures such as here, mere *ex parte* determinations of probable cause are simply impermissible under the U.S. Constitution. *See Fort Wayne Books*, 109 S.Ct. at 929; *Blount*, 400 U.S. at 420, 91 S.Ct. at 430.

Therefore, this court finds the defendant's prior restraint in this case violated the plaintiffs' rights under the First and Fourteenth Amendments. Permanent injunctive relief is necessary to prevent future infringements. This court is well aware of the serious implications of interfering with integral state functions such as law enforcement. However, when the Constitutional liberties which we all hold sacred are threatened, this court has both the power and the duty to intervene. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).

And so our legal odyssey ends.

What began as a dispute between two ancient enemies concludes with the hope that they are reconciled by a mutual friend—The Constitution of the United States.

■ Having considered the above matters and the record in this cause, it is hereby

ORDERED AND ADJUDGED as follows:

(1) The recording *As Nasty As They Wanna Be* created by the group 2 Live Crew is hereby DECLARED obscene.

(2) The action of the Broward County Sheriff's office in threatening retail music stores with arrest for selling the *Nasty* recording and presenting them with a copy of a probable cause order is hereby DECLARED unconstitutional as an improper prior restraint of free speech in violation of the First and Fourteenth Amendments to the United States Constitution.

(3) The defendant, Sheriff Nicholas Navarro, and his deputies, agents, servants, employees, attorneys, and persons in active concert or participation with any of them who receive actual notice of this order are all hereby PERMANENTLY ENJOINED from threatening employees, managers, or owners of retail stores selling musical recordings with arrest for selling allegedly obscene materials. The same persons are also hereby PERMANENTLY ENJOINED from presenting or speaking about any

probable cause order of obscenity to employees, managers, or owners of retail stores selling musical recordings. Nothing in this order shall be understood as prohibiting Sheriff Navarro or any of his deputies, agents, or employees from: (a) giving legal advice to any person who is suspected of violating a valid law prohibiting obscenity where such consultation is genuinely undertaken with the purpose of aiding the suspect to comply with the law and avoid prosecution under the obscenity laws, or (b) vigorously enforcing the obscenity laws of the state of Florida as mandated and required by section 847.011(9), Florida Statutes.

(4) The sole affirmative defense in the answer and the class action claims in the amended complaint are hereby DISMISSED. The plaintiffs amended their pleading to include class action allegations, but they never made a motion for certification of the class. Furthermore, the request to certify a class would be moot as this order awards the same relief which the class could conceivably seek. Judgment is not entered against the defendant on the affirmative defense because the class portion of the case is moot. However, the court does find that the plaintiffs have standing and are "interested part[ies]" within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

(5) Any party seeking costs or an award under section 1988, Title 42 of the U.S. Code, shall apply to the court within the time allowed by the Federal Rules of Civil Procedure, the local rules of this court, and other applicable law. The parties' applications, if any, shall include all appropriate factual and legal argument to support the request for an award.

(6) Judgment shall be ENTERED on the two counts of the amended complaint by separate order.

(7) The court shall RETAIN JURISDICTION to enforce the permanent injunction entered in this case.

DONE AND ORDERED.